# In the United States Court of Federal Claims

### No. 06-436C
### (Filed: April 30, 2013)

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * | |
|                        * | **Contract Disputes Act, 41 U.S.C. §§ 604** |
| **ULYSSES, INC.,**                * | **and 605; Request for Quotation;** |
|                        * | **Approved Source; 48 C.F.R. § 13.004;** |
|          **Plaintiff,**    * | **Termination for Convenience, FAR** |
|                        * | **52.249-1; Government Counterclaims;** |
| **v.**                    * | **False Claims Act, 31 U.S.C. § 3729 et** |
|                        * | **seq.; Government Knowledge Defense;** |
| **THE UNITED STATES,**      * | **Forfeiture of Fraudulent Claims Act,** |
|                        * | **28 U.S.C. § 2514.** |
|          **Defendant.**   * | |
|                        * | |
| * * * * * * * * * * * * * * * * * * * * * * * | |

Cyrus E. Phillips IV, Albo & Oblon, L.L.P., 2200 Clarendon Blvd., Suite 1201, Arlington, VA 22201, for Plaintiff.

Stuart F. Delery, Jeanne E. Davidson, Deborah A. Bynum, A. Bondurant Eley, and David D'Allesandris, Commercial Litigation Branch, Civil Division, Department of Justice, P.O. Box 480, Ben Franklin Station, Washington, D.C. 20044, for Defendant.

_____

**OPINION**

_____

**WILLIAMS**, Judge.

    This case comes before the Court following a trial on liability on Plaintiff's Contract Disputes Act ("CDA") claims and Defendant's counterclaims under the False Claims Act ("FCA"), Forfeiture of Fraudulent Claims Act ("FFCA"), and fraud provision of the CDA.[1] Plaintiff, Ulysses, Inc. ("Ulysses"), alleges that the Government wrongfully canceled two purchase orders for printed circuit cards, P/N 178AS112 ("112 Part"), and seeks either reinstatement of those purchase orders or payment for full performance.

_____

    [1] On January 4, 2011, after Defendant had filed its motion to dismiss, Congress reorganized Title 41 of the United States Code. See Act of Jan. 4, 2011, Pub.L. No. 111–350, 124 Stat. 3677 (2011). The CDA was recodified and moved from 41 U.S.C. §§ 601–13 to 41 U.S.C. §§ 7101–09, but Congress did not change the substantive law of the CDA as it relates to this decision.

The Court finds that the Government legally canceled the First Purchase Order because Plaintiff admittedly was manufacturing the part itself and not providing the exact part specified in Plaintiff's response to the Request for Quotation ("RFQ") and the resultant purchase order -- a Raytheon Technical Services Corporation ("Raytheon") part.  The Second Purchase Order is a different matter.  This purchase order described the item to be supplied as a part manufactured by Frequency Selective Networks ("Frequency") even though neither the RFQ nor Plaintiff's quote had mentioned the Frequency part.  When Plaintiff advised the Government that it would be supplying its own part, not the Frequency part, the Government canceled the Second Purchase Order.   Plaintiff claimed it had completed 80 to 85% of the order and challenged the cancellation, seeking termination for convenience damages.  Because "the contractor did not contribute to the mistake resulting in the award and was not on direct notice before award that the procedures being followed were wrong," the contract should be terminated for the convenience of the Government.  United States v. Amdahl, 786 F.2d 387, 395 (Fed. Cir. 1986).  Defendant's counterclaims fail for legal insufficiency and lack of proof.

## Findings of Fact[2]

### Ulysses, Inc.

Ulysses is a manufacturer of electronic equipment, transmitter receivers, and cable and mechanical assemblies.  Tr. 25.  Demetrios Tsoutsas is the president and owner of Ulysses.  Tr. 24.  Mr. Tsoutsas is also the president of Melstrom Manufacturing Corporation ("Melstrom"), a company located at the same address and having the same employees as Ulysses.  Tr. 24, 111.  Mr. Tsoutsas has been involved in Government contracting since 1962.  Tr. 32.  Mr. Tsoutsas operated four companies and estimated that his companies, Ulysses, Melstrom, Pluto Industries, Inc., and D&A Electronics Manufacturing Inc., earned a total of five million dollars in business from Government contracts.  Tr. 64, 311.  Sixty percent of Ulysses' sales were made to the United States Government, and the remaining forty percent were to large companies, such as Sikorsky Aircraft Corporation.  Tr. 25.

### Ulysses' and Melstrom's Prior Government Business

The 112 Part is one of two printed wiring board assemblies in the Aircraft Firing Circuit Test Set AN/AWM-54, also known as P/N 178AS100, or the "100 Part."  Tr. 26.  According to Mr. Tsoutsas, Ulysses and Melstrom have provided P/N 178AS100, the Aircraft Firing Circuit Test Set, which includes the 112 Part as a component, to the Government and other contractors who were performing under Government contracts since 1997.  See Tr. 166; DX 48 (Pl.'s Resp. to Def.'s First Set of Interrogatories).  Ulysses also received 28 Government contracts for P/N 178AS114, another more complicated component of 178AS100.  Tr. 26-27; PX 27.

---

[2]  These findings of fact are derived from the record developed during a two-day trial on liability, held March 12-13, 2012.  The Court uses "PX", "DX," and "JX" to cite exhibits and "Tr." to cite testimony.

The evidence with respect to Plaintiff's prior history of quoting the 112 Part is as follows. In 1998, Melstrom submitted a quote in response to a 112 Part solicitation. Tr. 67-70. In response, the Defense Supply Center Columbus ("DSCC") sent Mr. Tsoutsas a letter stating in pertinent part:

> Solicitation Number SP0960-98-R-X154 sent to 8 prospective Contractors was opened on July 1, 1998 with 1 approved offer received. After evaluation, your recent offer submitted in response to the above solicitation was not eligible for a contract award for the following reason(s):
>
> Your recent offer submitted in response to the above solicitation was not eligible as an alternate item. The next higher assembly is not an acceptable alternate for this National Stock Number (NSN) 5998-00-007-1450 [the Stock Number for the 112 part].
>
> Consequently, award [was] made as follows to the firm offering a previously approved item whose offer was judge[d] the most advantageous to the Government.

| Name and Address of Successful Offeror | Contract No. | Item | Quantity | Unit Price |
|---|---|---|---|---|
| Abrams Instrument Corp. 1322 Rensen Street Lansing, MI 48910-3688 | SP0960-99-D-C-001 | 001 | 168 | $438.20* *Weighted Average |

> If you wish to pursue approval prior to issuance of the next requirement, please contact Mr. Frank Washburn, DSCC-CACB Technician at 614-692-7412 or Ms. Wanda Robinson, DSCC Competition Advocacy Office at 614-692-2399.
>
> . . . .
>
> Your interest in bidding on the requirements of this Center is appreciated. Your name will be retained on the bidder's list to receive future solicitations.

JX 1. Neither the referenced solicitation (No. SP0960-98-R-X154) nor Plaintiff's response to the solicitation is in the record.

## Plaintiff's View on Whether It Was an Approved Source for the 112 Part

Mr. Tsoutsas did not think either Ulysses or Melstrom needed to go through the process to become an approved source for the 112 Part because the companies had already provided the 100 Part to the Government, which contained the 112 Part as a component. Mr. Tsoutsas believed that being qualified to produce the 100 Part automatically qualified his companies as approved sources for their component 112 Parts. Tr. 71. Neither Ulysses nor Melstrom attempted to become an approved source for the 112 Part. Tr. 76. Mr. Tsoutsas testified:

"Again, I don't know what steps to take because I already considered myself as an approved source because I built the overall equipment.  That's fact, and the fact is if you are manufacturer of the overall equipment you are an approved source for every component of it."  Tr. 72; see also Tr. 70-71, 101-02, 104-05, 108, 163-64, and 168-69.

When asked if Ulysses was an approved source for the 112 Part in 2002, Jim Mort, the "second in command" in Mr. Tsoutsas' companies, testified: "I don't think we had anything, such as a source approval request, approval, or any kind of first article approval that would indicate that we were an approved source, but we had provided it to other - - Sikorsky as a prime contractor in the test set."  Tr. 322.  Further, when asked "to the best of your knowledge were you an approved source for the United States Government for the 112 part?"  Mr. Mort answered "[n]o."  Tr. 323.  However, Mr. Mort subsequently testified that Ulysses had always been considered an approved source for the 112 Part:

> Q     Okay.  The first part of that sentence says, "Ulysses has always been considered an approved source for part number 178ASl12".  Do you believe that to be a true statement?
>
> A     With my knowledge of what we did at our company, yes.

Tr. 324-25.  At his deposition, Mr. Mort testified that Ulysses had not always been considered an approved source for the 112 Part.  Tr. 325.  At trial, he addressed the discrepancy in his testimony as follows:

> And again I come up with the same feeling when I walked away from this testimony or whatever this was, that the question was "Were they always considered an approved source," that statement that I said, "No" at that time, and I thoroughly believed it was no.  But when I throw in the fact that we built the test set, the next higher assembly, then yes, we were an accepted source.  Were we accepted by the government is the key to me, and no, we weren't.

Tr. 325-26.

### The First Request for Quotation

On March 11, 2002, DSCC issued Request for Quotation Number SP0900-02-T-CB06 ("First RFQ"), seeking printed circuit cards to use in an Aircraft Firing Circuit Test Set -- 178AS100.  DX 1.  The First RFQ stated in pertinent part:

| | |
|---|---|
| SOLICITATION NUMBER: | SP090002TCB06 |
| ISSUE DATE: | 03/11/02 |
| RETURN BY DATE: | 03/25/02 |
| REQUIRED DELIVERY DATE: | 06/19/02 |
| . . . | |

ALL QUOTES MUST BE SUBMITTED VIA THE DSCC INTERNET BID BOARD SYSTEM (DIBBS) AT . . . .

SOURCE INSPECTION REQUIRED - FAR 52.246-2 APPLIES.  DO NOT SUBMIT     QUOTES     LIMITING     INSPECTION     TO 'KIND/COUNT/CONDITION'
. . .

ITEM DESCRIPTION


CRITICAL APPLICATION ITEM
CIRCUIT CARD ASSEMBLY
THE USE OF ANY CLASS I OZONE-DEPLETING SUBSTANCE (ODS) IN THE DESIGN, MANUFACTURING, TESTING, CLEANING, OR ANY OTHER PROCESS FOR THIS ITEM UNDER ANY MILITARY OR FEDERAL SPECIFICATION, STANDARD, OR DRAWING REFERENCED IN THIS ITEM DESCRIPTION IS "PROHIBITED" UNLESS THE SEPARATE WRITTEN APPROVAL OF THE CONTRACTING OFFICER IS OBTAINED. THIS     PROHIBITION     SUPERSEDES     ALL     SPECIFICATION REQUIREMENTS BUT DOES NOT ALLEVIATE ANY PRODUCT PERFORMANCE REQUIREMENTS.   THIS DOES NOT APPLY TO COMMERCIAL ITEMS, AS DEFINED IN "FAR 11.001" OR TO PART-NUMBERED-ONLY ITEMS.
FOR PRINTED CIRCUIT BOARDS OR PRINTED WIRING BOARDS WHERE MIL-PRF-55110 (FORMERLY MIL-P-55110) OR MIL-P-50884 IS CITED, IT IS RECOMMENDED THAT MIL-PRF-31032 BE UTILIZED.  MIL-PRF-55110 IS PRESENTLY INACTIVE FOR NEW DESIGNS AND HAS BEEN REPLACED BY MIL-PRF-31032.   MIL-P-50884 WILL BECOME INACTIVE FOR NEW DESIGNS AND REPLACED BY MIL-PRF-31032. SINCE THERE CURRENTLY IS NO EQUIVALENT DOCUMENT FOR THE CANCELLED     MIL-S-13949     (FORMERLY     MIL-P-13949),     DSCC RECOMMENDS THAT THE CONTRACTOR HAVE A METHOD OF ASSURING THAT LAMINATE MATERIALS USED IN CONJUNCTION WITH DSCC CONTRACTS BE AT LEAST EQUIVALENT IN QUALITY AND RELIABILITY TO THAT WHICH WAS AVAILABLE PRIOR TO THE CANCELLATION OF MIL-S-13949 ON NOVEMBER 30, 1998.
ABRAMS INSTRUMENT CORP.                     00048 P/N 178AS112
RAYTHEON TECHNICAL SERVICES CO        072E5 P/N 178AS112
TECHNICAL SERVICES LABORATORY INC     51283 P/N/178AS112

0001 PR YPE02070000076            PRLI  0001    QTY 38 EA

. . .

PROCUREMENT HISTORY FOR NSN: 5998000071450

| TYPE | CAGE | CONTRACT NUMBER | QUANTITY | UNIT COST | AND DATE |
|------|------|-----------------|----------|-----------|----------|
| STK | 51283 | SP096001M6525 | 000130 | 585.00000 | 09/19/01 |
| STK | 00048 | SP096099DC0010001 | 000168 | 467.15000 | 11/06/98 |
| STK | 00048 | SP096097C0057 | 000411 | 335.65000 | 06/18/97 |

DX 1. The five-digit numbers to the right of the listed companies' names are the Contractor and Government Entity ("CAGE") Codes for each manufacturer. Raytheon's CAGE Code is 072E5. The First RFQ did not contain the term "approved source" and did not provide instructions for the submission of alternate bids.

The Defense Logistics Agency posted the First RFQ on the Agency's Internet Bid Board System ("DIBBS"), an internet-based procurement system. DX 1; Tr. 274. Alan Searfoss, a procurement analyst with the DIBBS Procurement Automated Contract Evaluation System ("PACE") Team at the Defense Logistics Agency in Columbus, Ohio testified about the DIBBS system generally and the use of the system in this procurement. Tr. 268. DIBBS allows vendors to view solicitations and submit quotes electronically. Tr. 269. To submit a quote via DIBBS, a contractor logs on with a user ID and password and then submits a quote against the requirement posted on DIBBS. Tr. 271. Mr. Searfoss testified: "[o]n certain solicitations we do have where we're requiring by what we call CAGE and part number, so a specific manufacturer's part number. When that happens . . . they're required to be supplying one of those exact items. We call it exact product." Tr. 271-72. Once a contractor submits its quote, DIBBS displays a summary screen depicting all of the information that the contractor provided, including the solicitation number, CAGE Code, bid type, National Stock Number, quantity, and price. Tr. 272-73; DX 22. The contractor must then click the "submit button" if it wishes to submit its quotation. Tr. 272-73.

## Mr. Tsoutsas' Understanding of the First RFQ

Based on his understanding of the First RFQ, Mr. Tsoutsas believed Ulysses was eligible to itself manufacture and provide the 112 Part to the Government because it had provided the 100 Part to the Government. Tr. 31-32. Further, because Ulysses supplied the 114 Part to the Government, Mr. Tsoutsas reasoned that it was qualified to provide a less complicated component -- the 112 Part. In reviewing the Navy's technical drawing for the 112 Part, Mr. Tsoutsas testified:

> Well, this, like I indicate to you, this was a part of the overall equipment, part number 178AS100. This particular item we had three previous government contracts on the overall equipment which includes this part 178AS112. This is a small part compared to the overall equipment. We're qualified to build the main equipment, which is the 178AS100, and that means any component which we also manufacture other components than 178AS114, which is a more complicated board, and the one in question here, the 178AS112.

6

> We had several contracts on this, and we never had any problems with the government, talking about with the government who had 15, 18 contracts or more than that with the government.
>
> . . .
>
> They supply us microfilm drawings for everything, including this board, and to the best of my ability if I'm qualified to build equipment itself, I should be qualified to build any part of it going into it, and I don't quite understand the argument here that we were not qualified to build the part which we were qualified to build the whole equipment, which that was part of it.

Tr. 26-28.  Mr. Tsoutsas testified that the Government never questioned whether Ulysses was an approved source for the 114 Part.  Tr. 169.

Mr. Tsoutsas acknowledged that three companies were listed in the First RFQ -- Abrams Instrument Corporation ("Abrams"), Raytheon, and Technical Services Laboratory, Incorporated ("Technical Services") -- but he did not think the Government was restricting the solicitation to 112 Parts produced by those companies.  When asked why the First Purchase Order listed Raytheon, Mr. Tsoutsas testified:

> And first of all, I don't believe the government will issue a contract to a contractor and ask him to go to Raytheon to buy the item which would cost the government a lot more money. Why should they do that when a manufacturer is an approved source for the overall equipment, has the knowledge to do it? Why the government will ask the company to go to Raytheon to buy the part?
>
> And I have a case where another company who does not appear anywhere in the list, and it's not part of the -- the [CAGE code] is not part of the existing history of the contracts.  So, this was something which is normal according to my knowledge, and I've been dealing with the Department of Defense since 1962. The [CAGE code] which appears in any bid for contract is only an indication who had contracts before on the item.  It's not -- the bidder is not obligated to go to any of these companies to buy the item and sell it to the government.

Tr. 31-32.

**Ulysses' Electronic Quotation Submitted in Response to the First RFQ**

On March 20, 2002, at 2:46 p.m. EST, Ulysses submitted an electronic quotation via DIBBS in response to the First RFQ using its own CAGE Code -- 54432.  DX 22 App. 231; DX 23.  In its quotation, Ulysses offered to supply 85 112 Parts at a total price of $44,625.  DX 22. The Submitted Quote Summary, which DIBBS displayed after Ulysses entered information for its quotation, listed the bid type as a "BID WITHOUT EXCEPTION."  DX 22 App. 231.  The summary provided:

PRODUCTS OFFERED:
    NSN:  5998000071450
    PRODUCT MFGED BY/UNDER THE DIRECTION OF
    CAGE:      072E5     P/N:   178AS112

DX 22 App. 232.  CAGE 072E5 is Raytheon's CAGE Code.  Mr. Searfoss testified as to how the Submitted Quote Summary from DIBBS would be displayed to the contractor:

> Well, when I look at the solicitation it's displayed just like this [Submitted Quote Summary], but when they actually are submitting the quote and they're saying exact product under a bid without exception, then there's a drop down menu on that exact product, and it will show all the approved sources.  In this case it would have shown the three approved sources.

Tr. 275.  Mr. Searfoss further testified that none of the three approved sources would be automatically preselected.  Tr. 275.  The Submitted Quote Summary does not show the options from the drop down menu.  DX 22.  Nor does the Submitted Quote Summary contain the words "approved source," but it lists the bid type as "BID WITHOUT EXCEPTION."  A paragraph at the bottom of the Submitted Quote Summary stated:

> NOTICE:
>
> > YOU HAVE STATED THAT THE PRODUCT OFFERED FOR [NATIONAL STOCK NUMBER] IS AN 'EXACT PRODUCT'.  EXACT PRODUCT MEANS CAGE 072E5 PART NUMBER 178AS112, MANUFACTURED BY OR UNDER THE DIRECTION OF CAGE 072E5.  IF YOU INTEND TO MANUFACTURE THIS ITEM, BUT ARE NOT CAGE 072E5, YOU MUST HAVE EVIDENCE OF A CURRENT CONTRACTUAL RELATIONSHIP WITH CAGE 072E5 TO MANUFACTURE AND SELL THIS ITEM AS CAGE 072E5 P/N 178AS112 IN ORDER TO QUOTE EXACT PRODUCT.  ANY PRODUCT NOT MEETING THESE CRITERIA IS CONSIDERED AN ALTERNATE PRODUCT EVEN THOUGH IT MAY BE MANUFACTURED IN ACCORDANCE WITH THE DRAWINGS AND/OR SPECIFICATIONS OF CAGE 072E5.  ANY INDICATION THAT YOU HAVE MISREPRESENTED THE PRODUCT OFFERED SHALL RESULT IN THE GOVERNMENT CONSIDERING RESCISSION OF ANY RESULTANT CONTRACT AND ALL OTHER SANCTIONS, CONTRACT PENALTIES, AND REMEDIES ESTABLISHED UNDER ANY OTHER LAW OR REGULATION.

DX 22 App. 232.  Mr. Searfoss testified that this notice would have appeared before a contractor submitted its quote.  Tr. 287.  The end of the summary read:

8

QUOTE SUBMITTED BY:

Company: ULYSSES INC

      USER NAME: DMETRIOS TSOUTSAS
      PHONE: (732) 938-7400  EXT:        FAX:  (732) 938-2765
      E-MAIL: MELSTROM@EROLS.COM

DX 22 App. 233.

Once a quotation was submitted via DIBBS, a page entitled "DIBBS Quote Form Submission," was displayed stating "Your Quote has been successfully submitted."  DX 23; Tr. 318.  The DIBBS Quote Form Submission for Plaintiff's electronic quotation listed the solicitation number (SP0900-02-T-CB06), total price ($44,625.00), the CAGE Code of the quoting company -- (Ulysses, 54432), the vendor quote number (M19703), the date and time of the quote (3/20/2002 2:46), and the name of the quoter (Demetrios Tsoutsas). DX 23.

The circumstances under which Ulysses submitted the electronic quotation in response to the First RFQ are somewhat murky.  Although Mr. Tsoutsas was listed as the person who submitted the quote, he disavowed any involvement in this electronic quotation.  He testified: "I was not involved with this at all.  The secretary was doing this.  My part in the bidding was like I indicated.  Getting the overall price for the component, whatever it is, and then put the labor and G&A and profit."  Tr. 83; see also Tr. 86.  He further testified: "To the best of my recollection, all bids were submitted via fax."  Tr. 84.  Mr. Tsoutsas continued:

Q     Now I'd like to direct your attention to . . . "DIBBS 'Form Submission'  --

A     I see.  Again, I don't recall because my recollection about that it was always faxed the information.  Now, I don't know -- like I say, I wasn't involved -- I didn't get involved with that because between the secretary and Mr. Mort that's who was taking care of this.  I wasn't involved with it.

Q     And you agree with this document on its face states, "Your quote has been successfully submitted," and it appears on the face to refer to Solicitation SP0900-02-T-CB06, correct?

A     I see what it says but like I said I don't recall whether it was electronic submitted or not.  I don't -- because to the best of my knowledge, all of the bids were submitted via fax.

Q     And this document purports to identify you as the quoter, correct?

A     Yes.

Q     And it appears to be dated March 20, 2002.

A    Yes.

Q    It's your testimony today that Ulysses, Inc. -- in light of your interrogatories and this document Ulysses, Inc. still did not submit any quotes by anything but fax during this 2002 timeframe?

A    I explained to you I don't recall it because I wasn't involved with this at all.

Q    Can you definitively state, therefore, since you weren't involved with this process at all, that Ulysses did not submit a quotation through the DIBBS system for --

A    Again, I don't recall. I don't recall what the secretary did because, like I said, I wasn't involved with it.  The only thing I did I finished the bid and gave it back to the office to submit the bid.  Now, if she did something like this, I don't recall.

Q    But sitting here today you can't definitively rule out that Ulysses, Inc. submitted a quote to Defense Supply Center Columbus for the 112 part on March 20, 2002, via the DIBBS PACE system based on your own personal knowledge, you can't rule that out, correct?

A    Like I said, we submitted the bid but I'm not sure how it was submitted.

. . .

        THE COURT: When you gave the secretary the bid, what did you give her?

        THE WITNESS: We have a form which has the items involved and says material quote so much.  Then it's labor, then it's G&A and profit.  I sign that b id which shows the selling price, and then she takes it from there and she was -- I wasn't aware what she did, but normally we fax that page.

Tr. 86-88.

When asked if his then secretary, Ms. Wilcox, had the authority to enter an electronic quotation, Mr. Tsoutsas testified:

A    Still I don't believe we had -- the letter which we saw which was written and I signed it, but I didn't even realize we would, but I don't think -- I don't think that she filed it electronically any quotes.  I don't recall any of that.

THE COURT: Now, Mr. Tsoutsas, you didn't answer the question. He asked you if Patty had the authority to --

THE WITNESS: The authority to type.

THE COURT: -- send electronic bids, quotes.

THE WITNESS: I don't recall, Your Honor.  I don't recall any electronically filing bids or anything like this.

THE COURT: So did she have the authority or not, yes or [no]?

THE WITNESS: To submit faxes?  Yes, she had to, was given to her after I signed it, yes.

THE COURT: He asked you --

MR. PHILLIPS: That's not the question.

THE COURT: He asked you electronic quotes.

MR. PHILLIPS: Electronic.

THE COURT: Did she have the authority to submit electronic quotes?

THE WITNESS: To my knowledge, no, because I didn't think it was anything like that.

Tr. 155-56.

Mr. Mort testified as to how Ulysses generally prepared and submitted quotations.  First, he and Mr. Tsoutsas would determine the cost of the requirement.  Tr. 314.  He explained the next step in the process:

> Once a price had been assigned, a lead time had been projected, our capabilities and what have you, we would then give it to our admin., and back in the old days, 2002, I think they were still doing it manually where you would actually type up the solicitation and send it to the government.  I'm not too sure whether that was done electronically at that time or not.

Tr. 314-15.  Mr. Mort further testified that Ms. Wilcox submitted quotations using DIBBS and that Mr. Tsoutsas was aware of the practice.  Tr. 318.  However, Mr. Mort did not know when Ms. Wilcox began using DIBBS.  Tr. 317-18.  Mr. Mort acknowledged that someone at Ulysses submitted the electronic quotation, but he had no knowledge of who submitted the electronic quote in response to the First RFQ.  Tr. 318-19.  In any event, Ulysses sent the electronic quotation to the Government, it was received on March 20, 2002, and it formed the basis of the First Purchase Order under which Ulysses seeks recovery.  DX 22, 23.

11

**Ulysses' Facsimile Quotation Submitted in Response to the First RFQ**

On the same date, Melstrom submitted a quotation to DSCC in hard copy via facsimile signed by Mr. Tsoutsas as the company's president. PX 6. Mr. Mort testified that Ms. Wilcox likely submitted this facsimile quotation. Tr. 335-36. The facsimile quotation referenced the solicitation number from the DIBBS solicitation, SP0900-02-T-CB06. The return address block on the quotation identified Mr. Tsoutsas as the president of Melstrom, with Melstrom's CAGE Code, 93953. PX 6. Mr. Mort testified that Ms. Wilcox mistakenly wrote Melstrom and Melstrom's CAGE Code on Plaintiff's facsimile quotation. Tr. 335-36. He further testified: "I spent a lot of time trying to replace Patty Wilcox. We had a lot of people come in. She knew her job very well. She just wasn't there often enough to be of much value, and I never could get anybody else to take her job. . . ." Tr. 336-37. Mr. Mort testified that Ms. Wilcox rarely worked a 40-hour week and that she "would go off to her . . . place in Maryland and may or may not come back." Tr. 337. When Ms. Wilcox was absent, Mr. Mort handled her duties. Tr. 337. Just as in Ulysses' electronic quotation, Melstrom's facsimile quotation offered to supply 85 112 Parts at a total price of $44,625, and provided that the offer was valid for 60 days. PX 6. Unlike Ulysses' electronic quotation, Melstrom's facsimile quotation did not include a vendor number or any representations and certifications. Compare PX 6, with DX 22. The Government never responded to Melstrom's facsimile quotation.

**The First Purchase Order Issued to Ulysses**

On April 29, 2002, DSCC issued Ulysses a purchase order in response to its March 20, 2002 electronic quotation. PX 7. FAR 52.249-1, the Termination for Convenience clause, was incorporated into the First Purchase Order. Def's Resp. in Opp'n to Pl.'s Mot. for Summary J. and Cross-Mot. for Summary J., App. 401. The purchase order listed Ulysses as the contractor, and the Vendor Quote Number from Ulysses' electronic quotation, M19703, a reference number assigned by the contractor. PX 7, 22. Block 16 of the purchase order stated: "Reference your offer dated 2002, MAR 20, M19703," -- a cross-reference to Ulysses' electronic quotation. Tr. 290. The item description on the purchase order referenced the CAGE Code listed on Ulysses' electronic quotation -- Raytheon's. Specifically, the purchase order stated:

ITEM DESCRIPTION:

CIRCUIT CARD ASSEMBLY

CRITICAL APPLICATION ITEM

RAYTHEON TECHNICAL SERVICES CO        (072E5)   P/N   178AS112

PX 7. The date of delivery was August 27, 2002. Mr. Tsoutsas testified that the reference to Raytheon in the item description section of the purchase order pertained to the history of procurements for the 112 Part and did not mean that Ulysses was required to supply the 112 Part manufactured by Raytheon. Tr. 91. He testified:

> [T]his is only reference.  It's not a requirement to go to Raytheon because the government will never do that, to ask you to go to another company, buy the item and sell it to the government because that multiplies the amount of money you have to put on it.

Tr. 92.

## **The Second RFQ**

On December 17, 2001, DSCC issued the Second RFQ on DIBBS, No. SP0900-02-T-K808, but the solicitation dropped out of the automated system when no qualified quotes were received by the December 31, 2001 closing date.  The Second RFQ itself is not in the record.  Defendant described the Second RFQ:

> Like the First RFQ, the Second RFQ requested quotes for the following part numbers and corresponding CAGE codes: Abrams Instrument Corp. (CAGE 00048) part number 178AS112; Raytheon Technical Services, Co. (CAGE 072E5) part number 178AS112; Technical Services Laboratory, Inc. (CAGE 51283) part number 178AS112. DX2.  The Second RFQ had been issued on December 17, 2001 on DIBBS, but dropped out of the automated system when no qualified quotes were received by the original solicitation closing date of December 31, 2001.

Def.'s Mem. of Contentions of Fact & Law ("Def.'s Mem.") 5-6.  No testimony or documentary evidence supports Defendant's characterization.  On December 10, 2012, the Court held a status conference and asked the parties to address whether the record should be reopened to admit the Second RFQ.  On December 12, 2012, Defendant filed a notice stating that "the document in question is not appropriately part of the trial record of this case" because Defendant did not present a witness to sponsor or discuss it and did not move for its admission.  Def.'s Notice 1. On December 13, 2012, Plaintiff filed a response to Defendant's notice stating:

> Because Defendant's Exhibit 2 appears to be a document generated by DSCC and, apparently, was not distributed in paper to Ulysses; an electronic document of which Ulysses has no knowledge; Ulysses has no grounds to object to Defendant's assertion that Defendant's Exhibit 2 for identification is not appropriately a part of the trial record.

Pl.'s Notice 2.

In June 2002, DSCC asked Ulysses for a quote on the 112 Part.  Defendant summarized the events as follows:

> In June 2002, a DSCC buyer, seeing Ulysses in the buy history for part number 178AS112, contacted Ulysses for a quote on RFQ No. SP090002TK808 (the "Second RFQ").  DX41.

13

. . .

> On June 19, 200[2], Mr. Tsoutsas responded to the Second RFQ, indicating that the quotation was being submitted by Melstrom Manufacturing Corporation ("Melstrom").  DX42.

Def.'s Mem. 5-6.  There is no evidence in the record reflecting the DSCC buyer's contact with Ulysses.

> Plaintiff provided its version of the events that led to Plaintiff's Second Quotation:

> By June 18th, 2002 DSCC had generated further requirements for Stray Energy printed circuit cards, Part Number 178AS112, and DSCC sent a facsimile to Ulysses asking for "pricing" on a total quantity of ninety-nine each.  On June 19th, 2002 Ulysses responded with a Quotation sent by facsimile.  Once again, Ulysses' facsimile Quotation identified the item only as a "Circuit Card Assembly," "Part Number 178AS112," and did not represent or identify any other controlling requirement for the manufacture of Part Number 178AS112.

Pl.'s Mem. of Contentions of Fact & Law ("Pl.'s Mem.") 9.   Defendant represented that Melstrom's June 19, 2002 facsimile quote was "in response to the Second RFQ," but Plaintiff made no mention of the Second RFQ, referring only to a "further requirement" for 99 Part 112 items.  Defendant admits that the Second RFQ did not mention the Frequency part that appeared in the resultant Purchase Order.  Def.'s Mem. 5-6.

**Ulysses' Facsimile Quotation Submitted in Response to the Second RFQ**

On June 19, 2002, Ulysses' sister company, Melstrom, submitted a facsimile quotation to DSCC, referencing the Second RFQ, quotation number SP0900-02-T-K808.  PX 8.  Melstrom's facsimile quotation identified the item only as a "Circuit Card Assembly," "Part Number 178AS112," and did not identify any manufacturer of the 112 Part.  PX 8.  Neither Ulysses nor Melstrom submitted an electronic quotation in response to either the Second RFQ or the DSCC buyer's request for a quote.  The facsimile quote was sent to DSCC from Demetrios Tsoutsas, president of Melstrom Manufacturing Corporation, CAGE 93953.  PX 8.  The quotation stated:

| SUBJECT: | SOL NO. | SP0900-02-T-K808 |
| | CLOSES: | 2002 JUNE 19 |

WITH REFERENCE TO THE SUBJECT, WE HEREIN WISH TO SUBMIT OUR QUOTE AS FOLLOWS:

| NSN | 5998-00-007-1450 |
| P/N | 178AS112 |
| NOMEN: | CIRCUIT CARD ASSEMBLY |
| QUANTITY: | 99 @$510.00=$50,490.00 |
| DELIVERY: | 120 DAYS ARO |

PX 8.  The quotation did not identify any particular company as the manufacturer of the 112 Parts to be provided, and the only CAGE Code on the quotation was Melstrom's -- 93953.  Mr. Tsoutsas signed the facsimile quotation as president of Melstrom.  PX 8.

## The Second Purchase Order

On June 27, 2002, DSCC issued a Second Purchase Order to Ulysses for 99 112 Part units for a total price of $50,490.  PX 9.  The purchase order listed Ulysses as the contractor and referenced an "offer dated 2002 JUN 19, Demetrios Tsoutsas."  PX 9.  Neither the record nor the parties' briefs address why the Second Purchase Order was issued to Ulysses, when Melstrom had submitted the quotation.  The Second Purchase Order contained the Termination for Convenience clause, FAR 52.249-1.  Def's Resp. in Opp'n to Pl.'s Mot. for Summary J. and Cross-Mot. for Summary J., App. 401.  The purchase order provided the following item description:

ITEM DESCRIPTION:

CIRCUIT CARD ASSEMBLY

CRITICAL APPLICATION ITEM

FREQUENCY SELECTIVE NETWORKS INC   (56662) P/N     178AS112

PX 9.

Although the Purchase Order referenced Frequency, Mr. Tsoutsas did not believe that this purchase order required Ulysses to provide 112 Parts manufactured by Frequency.  He testified:

Q      What about this reference to Frequency Selective Networks?

A      Again, this is an indication that this company had also a contract on this item.  As I indicated before, practically in every bid and contract they will show who had a contract on the particular item.

Q      And that's the way you read this contract, this purchase order, excuse me.

A      Yes, we bid it directly.  We didn't go to this company to get the price from them and then sell it to the government because, as I indicated, we were qualified to build the item.

Tr. 45.  Mr. Tsoutsas testified that Ulysses did not represent to DSCC that it would manufacture the 112 Part under the direction of Raytheon or Frequency, rather "[w]e indicated to Columbus that we considered ourselves an approved source because of the fact that we supplied the overall equipment on the 178AS100, and that means that if I'm building the overall equipment I'm qualified to build any small component of it."  Tr. 60-61.

15

Brian Kennedy was a post-award administrator at DSCC when both purchase orders for the 112 Part were issued to Ulysses. Tr. 203-04. Mr. Kennedy was not involved in issuing the Second Purchase Order, but he testified that the buyer at DSCC would have manually inserted the reference to Frequency in the Second Purchase Order. Tr. 223. Specifically, Mr. Kennedy testified: "[t]he system we use is DPACS, and as you go through each step there's areas where you can actually put comments in, so this would be an area under the item description that would deal with the area where you can type in comments." Tr. 223.

## Post-Award Review, Stop Work Order, and Cancellation

Mr. Kennedy learned that Ulysses was not going to deliver 112 Parts made by or under the direction of Raytheon or Frequency, but he could not recall how or when he learned this. Tr. 225-26. Mr. Kennedy contacted Ulysses and spoke with Mr. Tsoutsas about the purchase orders and asked whether Ulysses was an approved source for the 112 Part. Tr. 225-26. Mr. Kennedy testified that an approved source was "a source that has been, you know, through either any of the service activities that would actually bind before the technical groups have said, yes, this is a source that you can buy from, this is a source that, you know, you can procure the item." Tr. 204. Mr. Kennedy determined that he needed more information from Ulysses to determine whether it was an approved source and issued a stop work order on August 19, 2002. PX 10; Tr. 226-27.

On August 26, 2002, Mr. Tsoutsas sent a letter to Mr. Kennedy stating that Melstrom and Ulysses had been manufacturers of the "end item, or Circuit Firing Equipment P/N 178AS100; the subject contract item is an internal component of the above equipment," and attaching copies of orders for the 112 Part, which he claimed Ulysses had sold to Sikorsky Aircraft, Acro International Inc., and the Australian government. PX 11.[3] In this letter, Mr. Tsoutsas asserted that because Ulysses was able to produce "a much more complicated assembly than the subject item," the Government should have confidence that Ulysses was able to produce the 112 Part. PX 11. Further, Mr. Tsoutsas requested that DSCC "indicate in [its] records that we are the manufacturer of the equipment P/N 178AS100 as well as all of the sub-assemblies within the equipment itself." PX 11.

DSCC determined that none of the assertions in Ulysses' August 26 letter were sufficient to establish that it was an approved source for the 112 Part, because the orders at issue were not for the 100 Part or the 114 Part, "none of the examples given were with the federal government," and DSCC had no records indicating that Ulysses was currently an approved source for the 112 Part. Tr. 229.

On October 21, 2002, Mr. Kennedy wrote a letter to Ulysses stating that DSCC had not previously procured the item from Ulysses and requesting "technical data" to determine whether Ulysses was an approved source for the 112 Part. JX 8. Mr. Kennedy did not define the term technical data in that letter. Mr. Tsoutsas understood "technical data" to mean the drawings that

---

[3] The referenced orders for the 112 Part are not attached to the August 26, 2002 letter in the record. PX 11.

the Government provided to Ulysses.  Tr. 116, 124.  In testimony at trial, Mr. Kennedy disagreed with Mr. Tsoutsas' definition of technical data as being "comprised of a drawing the government gave to him."  Tr. 262-63.  Rather, in Mr. Kennedy's view, technical data consisted of tooling, certifications on the tooling, or certifications of the materials used.  Tr. 265.  According to Mr. Tsoutsas there is no difference between "technical data" and "technical testing" because "the testing has to be in accordance with the drawing."  Tr. 169-70.  Mr. Tsoutsas testified that he could not submit anything beyond the drawings because "[t]here is no additional technical data. It's only one technical data the government supplies and that was sufficient data to manufacture the item."  Tr. 117.[4]

On November 13, 2002, Mr. Tsoutsas sent another letter to Mr. Kennedy, again asserting that Ulysses was "the manufacturer of the subject contract item as well as the next higher assembly, which is the equipment itself," and informing Mr. Kennedy that Ulysses had completed 95% of the First Purchase Order and 80 to 85% of the Second Purchase Order and that Ulysses intended to resume production and complete the remaining work.  PX 14.

In a response dated November 20, 2002, Mr. Kennedy reiterated that DSCC had issued stop work orders on both purchase orders effective August 19, 2002, and Ulysses was required to submit all test data so that DSCC could determine if Ulysses was an approved source.  JX 10.  In this letter, Mr. Kennedy stated:

> [Y]ou mentioned that Ulysses Inc. had sold the item in the past to the Navy and that you could submit proof of this.  As of today, this office has received neither the data requested nor any documented proof of previous military sale.  The government is not responsible for costs of manufacturing an item that does not meet stated military specifications and standards.  Neither one of the quotes Ulysses Inc. submitted for these awards stated you were making alternate part bids . . . proper documentation must be submitted for government review.  It has been 90 days since the request for information was made and this office is still awaiting the documentation.

JX 10.  In a response dated November 20, 2002, Mr. Tsoutsas wrote that he could not prove that Ulysses held Government contracts for the 112 Part in the past because it had not retained the documents, but that Ulysses was a qualified supplier.  JX 11.  Mr. Tsoutsas continued:

> Ulysses, Inc. has been a prime contractor to the Government since 1975 and has successfully performed on thousands of procurements.  According to Federal Acquisition Regulations the Government has remedies for everything.  If you are in doubt of our ability to manufacture the item, after all the information we have provided to you, you can impose a F/A [first article] requirement or you

---

[4] One of the technical drawings for the 112 Part was admitted into evidence at Plaintiff's request.  PX 3.  Mr. Tsoutsas testified that there were approximately six drawings for the 112 Part, and that a company would need all of the drawings to produce the part.  Tr. 165-66.

can have DCMC representatives to verify the data in our files as well as witness the inspection and test of the subject unit and report to your office accordingly.

As I had indicated in our letter of November 13, 2002, in view of the fact that as of the time we received the stop work order we were close to completion, we decided to complete the units for reasons explained. Therefore, if you are still in doubt about our ability to manufacture the units according to military specifications and standards, you may impose a F/A requirement at no cost to the Government, which F/A can be tested and inspected in our facility or can be sent to any designated Government facility by your office and this can be accomplished within ten (10) working days as far as we are concerned.

JX 11. In the letter, Mr. Tsoutsas stated he was providing a copy of the assembly drawing for the 112 Part, but the drawing was not included with the letter admitted into the record. Id. Mr. Tsoutsas testified that the drawings established that Ulysses had previously provided the 112 Part to the Government and that Ulysses was an approved source because the Government itself provided Ulysses with the drawings. Tr. 102-04. Mr. Kennedy testified that the technical drawing would not constitute sufficient technical data because the drawing was maintained by the Government and available to anyone interested in responding to a request for quotation. Tr. 262-63.

On December 2, 2002, Mr. Kennedy responded to the November 20 letter, repeating that DSCC had no records showing Ulysses as supplier of the 112 Part, and Ulysses had not provided any evidence that it previously sold the part to the Government. JX 12. Mr. Kennedy informed Mr. Tsoutsas that DSCC did not receive a copy of the 112 Part drawing and Ulysses needed to submit technical data if it wanted to be an approved source. On December 6, 2002, Mr. Tsoutsas sent a letter in response to the December 2 letter, which repeated his prior arguments and did not provide any technical data. PX 18.

In February 2003, Mr. Kennedy sent another letter to Mr. Tsoutsas stating that Ulysses was not a Navy-approved manufacturer of the 112 Part. JX 14.[5] He stated: "Ulysses Inc. quoted 'Bid Without Exception' to supply CAGE 072E5 part number 178AS112. This is the exact item that must be supplied for this award. If Ulysses Inc. cannot supply the exact item the award will be canceled without cost to the government." JX 14. The letter provided the Navy's website where Source Approval Request forms and requirements were available. JX 14. In six separate letters, spanning October 2002, to February 2006, Plaintiff clearly informed the Government that it was manufacturing the 112 Parts itself. See JX 7, 11, 15, 16, and 17; PX 28.

By February 2003, the technical team had told Mr. Kennedy that Ulysses was not an approved source for the 112 Part. Tr. 245. Mr. Kennedy testified that if Ulysses wanted to be a

---

[5] JX 14 is dated February 14, 2002, but handwritten notations indicate the correct date is February 14, 2003. Tr. 129-30.

Navy-approved source of supply, it needed to submit a Source Approval Request.  Mr. Kennedy testified about the process of becoming an approved source:

> Well, from my knowledge, there would be some sort of data collection, tests, whatever it is, whatever the technical requirements are, that data package is collected and sent to the service activity, whether it's the Army, Navy, Air [F]orce, Marines, whoever is in control of the item, and at that point that engineer support activity -- Army, Navy, Air [F]orce, Marines, whoever it is -- makes the decision whether that company is an approved or unapproved source.

Tr. 205.  He further testified that DSCC did not have any role in the data collection or evaluation. Tr. 205.  Rather, the engineering support activity -- or the technical arm of the service -- had full control of evaluation source approval requests.  Tr. 205-06.  No witness from the engineering support activity testified.

Ulysses did not submit a Source Approval Request.  Mr. Tsoutsas testified that he did not see a need to submit a technical data package because "I don't understand why should I submit something which already the government gave me."  Tr. 76.  Instead, on February 24, 2003, Mr. Tsoutsas requested that Mr. Kennedy refer the matter to DSCC's legal department.  JX 15.  On June 17, 2003, DSCC canceled both purchase orders at no cost to the Government, issuing unilateral modifications.  PX 24, 25.

**Contract Disputes Act Claim**

On February 16, 2006, Ulysses submitted a certified CDA claim to the Defense Logistics Agency contracting officer, seeking $95,115 in connection with the cancellation of the 112 Part purchase orders.  PX 28.  In the claim, Mr. Tsoutsas asserted that the Government wrongfully canceled two purchase orders, and the Government was liable to Ulysses for $95,115, the combined value of the two purchase orders.  Id.  Mr. Tsoutsas contended: "Ulysses has always been considered as an approved source for P/N 178AS112 and the final component P/N 178AS100.  If Ulysses was in fact not an approved source for parts 178AS112, and P/N 178AS100, the agency had waived the requirement in the past."  PX 28.  He continued: "[t]he government failed to exercise proper discretion and inspect and perform First Article testing on the part . . . ."  PX 28 at 3.  Ulysses requested the following relief:

1. Issue a determination that the Agency should accept Part 178AS112 as Ulysses is an approved source and pay Ulysses the total contract amount for Contract 4209 for a value of $44,625.00.

2. Issue a determination that the Agency should accept Part 178AS112 as Ulysses is an approved source and pay Ulysses the total contract amount for Contract 5456 for the production of ninety-nine units of this identical item for a total value of $50,490.00.

3. Issue a determination that if Ulysses is not on the agency's approved source list then by allowing Ulysses to provide these parts in the past, the government

> has waived the requirement for Ulysses to be on the approved source list and should pay Ulysses the total contract amount for Contract 4209 and 5456 totaling $95,115.00.

PX 28 at 3.

On April 7, 2006, the contracting officer issued a final decision denying Plaintiff's CDA claim, reiterating that the purchase orders were issued to procure 112 Parts manufactured by Raytheon or Frequency. PX 29. The contracting officer wrote:

> Purchase order SP0960-02-M-4209 was issued to your company for the purchase of part number 178AS112 manufactured by CAGE 072E5, Raytheon Technical Services. Purchase Order SP0960-02-M-5456 was issued to your company for the purchase of part number 178AS112 manufactured by CAGE 56662, Frequency Selective Networks, Inc. When we learned that you would not provide the parts of these specific manufacturers but instead intended to manufacture them yourself, we placed a stop work order and requested documentation from you that you in fact were an approved source for these items, as you claimed. Although you repeatedly alleged that you were an approved source for these items, you provided nothing to indicate that the government had ever approved you as a source. The documentation you provided indicated that you had previously made these parts for private contractors and for the Australian government, but not for the U.S. Government. As a result, we canceled the purchase orders.

PX 29. The contracting officer further explained that purchase orders were revocable until the contractor began substantial performance and that because Ulysses never began the specified performance, the cancellation was proper:

> As we have previously informed you, a purchase order is not a contract, but is an offer by the government that a contractor can accept by delivery of the specified performance. The offer becomes irrevocable when the contractor substantially begins the specified performance. The specified performance under these two orders was delivery of the parts manufactured by Raytheon Technical Services and Frequency Selective Networks. You did not substantially begin this specified performance, and as a result the purchase orders were revocable. The cancellation was proper, no contract for the specified part was entered into, and the government is not obligated to pay for the costs you expended in manufacturing your own parts.

PX 29.

**Procedural History**

On May 30, 2006, Plaintiff filed the instant action alleging that the Government improperly canceled two contracts to manufacture part number 178AS112, seeking the total

amounts for both purchase orders, $95,115, as well as declaratory relief.[6]   In July 2007, Defendant filed an amended answer, asserting affirmative defenses and counterclaims. Specifically, Defendant alleged that Ulysses violated the False Claims Act when it submitted its quotation on March 20, 2002, in response to the First RFQ and when it submitted its CDA claim in February 2006, contending:

> Ulysses fraudulently induced the Government to issue two purchase orders to Ulysses.  Ulysses knew: (1) that it could only submit a quote if it intended to supply parts from an approved manufacturer; (2) that it was not an approved manufacturer; (3) that it planned to deliver parts that it manufactured and pass them off as approved parts.  Moreover, Ulysses compounded its lie by falsely representing to the contracting officer that it was an authorized manufacturer and in submitting its February 16, 2006 certified claim for payment to the contracting officer.

Def.'s Mot. for Leave to Amend its Answer 10.  Defendant does not allege that Plaintiff violated the FCA by submitting the June 19, 2002 quotation that led to the Second Purchase Order.

Further, Defendant alleged that Ulysses is liable under the Forfeiture of Fraudulent Claims Act because it "practiced or attempted to practice fraud against the United States in the proof, statement, establishment, or allowance" of its claims when it claimed to be an approved manufacturer to obtain two purchase orders and when it presented its CDA claim with the "intent to cause the Government to pay Ulysses amounts to which it knows it is not entitled."  Am. Answer ¶ 88.  Lastly, Defendant claimed Ulysses is liable under the fraud provision of the CDA because "Ulysses made several false statements of substantive fact with the intent to deceive or mislead the Government" when it filed its CDA claim challenging the canceled purchase orders. Def.'s Mot. for Leave to Amend its Answer 13.

---

[6]   Trial in this matter was originally scheduled for August 2008, but resolution of this case was delayed several times at the request of both parties.  This matter was stayed from February 26, 2008, to September 8, 2008, and again from October 1, 2009, to April 15, 2010, at the request of the parties.  In addition, Plaintiff has been represented by three different counsel over the course of this litigation.  After Plaintiff's first counsel withdrew effective September 8, 2008, and Plaintiff failed to obtain new counsel, the Court dismissed Plaintiff's claims.  Order of Partial Dismissal, Jan. 15, 2009.  Plaintiff subsequently obtained new counsel and filed a motion for reconsideration of the partial dismissal, which the Court granted.  After summary judgment briefing was completed, Plaintiff's second attorney moved to withdraw in May 2011, and the Court granted the motion.  Order Granting Motion to Withdraw as Attorney, June 10, 2011. Plaintiff's current counsel became counsel of record in August 2011, and the Court conducted trial in March 2012.

**Discussion**

**Jurisdiction**

The Court has jurisdiction over this case pursuant to the Tucker Act. The Tucker Act provides, in relevant part, that "[t]he Court of Federal Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 10(a)(1) of the Contract Disputes Act of 1978, including a dispute concerning termination of a contract . . . ." 28 U.S.C. § 1491(a)(2) (2000).

The Court has jurisdiction over Defendant's counterclaims under 28 U.S.C. §§ 1503 and 2508, which give this Court jurisdiction to render judgment on any set-off or demand that the Government seeks from any plaintiff for actions in this Court. See Daff v. United States, 78 F.3d 1566, 1573 (Fed. Cir. 1996); Martin J. Simko Constr., Inc. v. United States, 852 F.2d. 540, 542 (Fed. Cir. 1988); Brown v. United States, 207 Ct. Cl. 768, 786-87 (1975). Moreover, Section 1503 of Title 28 gives this Court jurisdiction over such claims, stating that "[t]he United States Court of Federal Claims shall have jurisdiction to render judgment upon any set-off or demand by the United States against any plaintiff in such court." 28 U.S.C. § 1503 (2000); see also 28 U.S.C. § 2508 (2000) ("Upon the trial of any suit in the United States Court of Federal Claims in which any setoff, counterclaim, claim for damages, or other demand is set up on the part of the United States against any plaintiff making claim against the United States in said court, the court shall hear and determine such claim or demand both for and against the United States and plaintiff.").

**The Government Properly Canceled the First Purchase Order**

Plaintiff alleges that DSCC wrongfully canceled two purchase orders that it was awarded for the 112 Part. Plaintiff's claim rests upon the assumption that it had a valid contract to provide 112 Parts to the Government. This Court concludes that as a matter of law no contract arose under the First Purchase Order. The Court of Federal Claims and the Boards of Contract Appeals have held that the Government's issuance of a purchase order is an offer to enter into a unilateral contract, and the Government is not bound until substantial performance occurs. "A purchase order 'is an offer by the government to the supplier to buy certain supplies or services upon specific conditions. A contract is established when the supplier accepts the order, by furnishing the supplies or services ordered or by . . . substantial performance prior to the due date.'" Canal 66 P'ship v. United States, 87 Fed. Cl. 722, 726 (2009) (quoting Zhengxing v. United States, 71 Fed. Cl. 732, 738 n. 21 (2006)); see also Smart Bus. Machs. v. United States, 72 Fed. Cl. 706, 708 (2006; Appeal of Master Research & Mfg., Inc., ASBCA. No. 46341, 94-2 BCA ¶ 26747, 1994 WL 85736, at *4 (Mar. 9, 1994). Once the offeree substantially performs, a unilateral offer is irrevocable. FAR 13.004(b) (2006) ("[T]he supplier may indicate acceptance by furnishing the supplies or services ordered or by proceeding with the work to the point where substantial performance has occurred.").

In this case, DSCC issued the First Purchase Order for 112 Parts manufactured by Raytheon in response to Plaintiff's electronic quotation, not in response to Plaintiff's facsimile

quotation as Plaintiff contends.  The First Purchase Order references information contained in Plaintiff's electronic quotation that was not in its facsimile quotation.  First, Block 16 of the First Purchase Order references "offer dated 2002 MAR 20, M19703."  PX 7 (emphasis added).  Only the electronic quotation contained the vendor number M19703.  Second, the First Purchase Order listed Ulysses' CAGE Code.  While Ulysses' CAGE Code was in its electronic quotation, the facsimile quotation came from Melstrom and listed Melstrom's CAGE Code.  Further, the First RFQ required that quotes be submitted electronically, stating: "ALL QUOTES MUST BE SUBMITTED VIA THE DSCC INTERNET BID BOARD SYSTEM (DIBBS)."  DX 1.

While Mr. Tsoutsas disavowed any personal involvement in submitting the electronic quote on behalf of Ulysses, the electronic quotation was submitted by someone from Ulysses -- likely by Mr. Tsoutsas' secretary, Patty Wilcox.  DX 22; Tr. 86-88, 317-18.[7]  Plaintiff's contention that the First Purchase Order was predicated on its facsimile quotation is not supported by the record.

In its electronic quotation, Plaintiff submitted a bid without exception and offered to provide 112 Parts manufactured by or under the direction of CAGE 072E5 -- Raytheon.  The DIBBS electronic screen displayed Ulysses' Submitted Quote Summary and expressly listed the bid type as "BID WITHOUT EXCEPTION" and included a notice that acknowledged Ulysses' offer was for an "EXACT PRODUCT" -- meaning "CAGE 072E5 PART NUMBER 178AS112, MANUFACTURED BY OR UNDER THE DIRECTION OF CAGE 072E5."  DX 22 App. 231-32.  Further, this notice informed Plaintiff that the Government could rescind the purchase order if Plaintiff had misrepresented the product offered.  DX 22 App. 232.  Thus, under the terms of Ulysses' electronic quote, Ulysses offered, and DSCC expected to receive, 112 Parts manufactured by Raytheon.  Mr. Tsoutsas' disavowal of Ulysses' electronic quote does not alter the terms of either that quote or of the resultant Purchase Order.  Even accepting that Mr. Tsoutsas reasonably believed Ulysses could itself manufacture the 112 Part under the First Purchase Order, this belief was erroneous and does not excuse Ulysses' failure to provide the Raytheon part.  Given that Ulysses clearly indicated it would not provide the 112 Part manufactured by Raytheon and was instead manufacturing the part itself, the Government legally canceled the First Purchase Order, before it ever blossomed into a contract.

### Plaintiff Is Not Entitled to Reformation of the First Purchase Order

Plaintiff argues that it is entitled to reformation because DSCC knew or should have known at the time of contract formation that Plaintiff made a mistake in quoting the Raytheon part in the electronic quote when it had quoted its own 112 Part in the facsimile quote and in an earlier quote from 1998.  Plaintiff argues:

---

[7]  Although Ms. Wilcox did not testify, both Messrs. Tsoutsas and Mort acknowledged that she could have submitted the electronic quote.  Tr. 87 ("I don't recall what the secretary did because, like I said, I wasn't involved with it.  The only thing I did I finished the bid and gave it back to the office to submit the bid. . . . we submitted the bid but I'm not sure how it was submitted.");  Tr. 318 (testifying that Ms. Wilcox submitted bids via DIBBS).

> Defendant DSCC knew as of July 1st, 1998 that Plaintiff was Quoting 112 printed wiring board assemblies of Plaintiff's own manufacture to the Navy Part Number, to the Navy drawing, and to the documents referenced on the Navy drawings, and Defendant DSCC knew then that it had not recognized Plaintiff as an approved source.

Pl.'s Post-Trial Br. 26.

"The purpose of [reformation] is to correct contractual instruments and make them conform to the clear intent of the parties. Reformation is in order only where there is a clear-cut clerical or arithmetical error or such a misreading of the contractual documents as to constitute an egregious blunder." Highway Prods., Inc. v. United States, 208 Ct. Cl. 926, 946 (1976) (per curiam). The degree of proof required to establish reformation is high -- clear and convincing evidence. United States v. Hamilton Enters., 711 F.2d 1038, 1046 (Fed. Cir. 1983); Bromley Contracting Co. v. United States, 219 Ct. Cl. 517, 536 (1979) ("Plaintiff, of course, must still establish by 'clear and convincing' evidence what it would have bid absent the mistake in order to have the contract reformed to its intended bid."). Under Federal Circuit precedent, "[a] contract will not be reformed because of a unilateral mistake in a bid unless the contractor establishes that the error resulted from a clear cut clerical or arithmetical error, or a misreading of the specifications." Liebherr Crane Corp. v. United States, 810 F.2d 1153, 1157 (Fed. Cir. 1987) (quoting Hamilton Enters., 711 F.2d at 1046).

Plaintiff contends that "DSCC knew as of July 1st, 1998 that Plaintiff was Quoting 112 printed wiring board assemblies of Plaintiff's own manufacture" and should have questioned the circumstances "on March 20th, 2002 [when] Plaintiff's wayward secretary submitted an electronic quotation for 112 printed wiring board assemblies manufactured by an aerospace Prime Contractor, not by Plaintiff." Pl.'s Post-Trial Br. 26. Further, Plaintiff contends that DSCC should have questioned the discrepancy between the electronic quotation and the facsimile quotation. Id. at 27.

Plaintiff's argument that DSCC should have suspected a mistake on Ulysses' part is misplaced. There was nothing on the face of Ulysses' electronic quote to suggest that it would not be providing the 112 Part manufactured by Raytheon. Rather, Ulysses' electronic quote offered the "exact product," the Raytheon 112 Part in the requisite quantity at a stated price. Ulysses' quote did not signal that Ulysses mistakenly believed it could manufacture the 112 Part itself.

Mr. Tsoutsas' mistaken interpretations -- that Ulysses could manufacture the 112 Part itself and that Raytheon was mentioned in the Purchase Order only to indicate the procurement history of this part -- would not have been apparent to the Government. So too, Mr. Tsoutsas' impression that his companies were approved sources for the 112 Part because they had previously supplied that part to the Government as a component of the 100 Part is based on Mr. Tsoutsas' extrinsic understanding, not on the language of the Purchase Order at issue. Mr. Tsoutsas' mistaken interpretation of the Purchase Order was exclusively the product of his own unwarranted assumptions which were not reflected in that Purchase Order. As such, Mr.

Tsoutsas' misunderstanding that Ulysses could manufacture the 112 Part itself does not provide grounds for reformation.

## **The Government's Cancellation of the Second Purchase Order Was Unreasonable**

The Government canceled the Second Purchase Order because Plaintiff refused to provide the exact product listed in the Purchase Order's item description -- a 112 Part manufactured by Frequency. Plaintiff contends that the cancellation was illegal because Plaintiff reasonably interpreted the Second Purchase Order as permitting Plaintiff to supply a 112 Part it manufactured itself. The Government counters that it justifiably canceled the order once it learned Plaintiff had no intention of supplying the Frequency part and every intention of manufacturing its own 112 Part, even though the Government did not consider Plaintiff an approved source.

The problem with the Government's position is that the listing of the Frequency part in the Second Purchase Order came out of nowhere. The Second RFQ (which had been withdrawn) requested quotes for 112 Parts listing CAGE Codes of three companies, but none of those was Frequency. After this RFQ was withdrawn, DSCC contacted Ulysses and requested the 112 Part, but nothing in the record describes this contact. Whatever was communicated, Mr. Tsoutsas, as president of Melstorm, Ulysses' sister company, submitted a quote for an unspecified 112 Part without reference to any particular manufacturer. The quote was not electronic. It was sent via facsimile but referred to the solicitation number of the withdrawn electronic RFQ. In its quotation, Plaintiff never offered to supply the Frequency part -- Plaintiff did not name any particular part, just the 112 "circuit card assembly," and the only CAGE Code number on the quote was that of Melstrom. In response to this quote, the Government issued a Purchase Order to Ulysses that listed a company in the item description never before mentioned -- Frequency. Mr. Tsoutsas, consistent with his interpretation of the First Purchase Order, believed that the listing of the name of a company in the item description referenced prior procurement history and did not require his company to supply a part manufactured by that named company. Plaintiff began manufacturing its own 112 Part and claims it was 80 to 85% complete when the Government canceled the order on June 17, 2003, almost one year after the Second Purchase Order had been issued on June 27, 2002.

There was no meeting of the minds here. The Government thought it was going to get a Frequency part, and Plaintiff thought it had free rein to manufacture its own part. Unlike the First Purchase Order, Plaintiff's interpretation was not based on unwarranted assumptions. Rather, Plaintiff reasonably believed it could supply its own part given the wording of Ulysses' quote which did not mention Frequency.[8] How Frequency appeared in the Purchase Order after having been nowhere in the RFQ and nowhere in Plaintiff's facsimile quotation remains a

---

[8] In addition, although Plaintiff had no knowledge of the Second RFQ, that RFQ did not mention Frequency. See Pl.'s Response to Def.'s Notice Re Proposed Admission of DX2 at 2.

mystery.[9]  Plaintiff's second quotation was only sent via facsimile and contained none of the information in the DIBBS system.  Unlike in Plaintiff's electronic quotation in response to the First RFQ, there was no acknowledgement in the facsimile quote that Plaintiff had to provide an "exact product."  Under the circumstances, Plaintiff's belief that it could perform in accordance with its quotation and supply its own 112 Part was reasonable.  The Government's sole articulated rationale for canceling the Second Purchase Order -- failure to supply the Frequency part -- is unsustainable.

Fashioning an appropriate remedy for this cancellation presents a dilemma.  There were multiple problems in the formation of the contract.  A contract arose when Ulysses substantially performed the Second Purchase Order.  Plaintiff reasonably believed it could fulfill the purchase order by manufacturing the 112 Part, began to do so, and according to Mr. Tsoutsas, was 80 to 85% complete at the time of cancellation.  Mr. Tsoutsas' testimony is unrefuted.  However, the record does not illuminate what transpired when Defendant solicited the quotation from Plaintiff, and Plaintiff was unaware of the defunct RFQ.  The resultant purchase order is an enigma.  The Government thought it ordered the Frequency part, and Ulysses had no intention of providing it, believing it could manufacture the part itself.  Under the circumstances, the legality of the contract cannot be presumed.  The question arises then whether this contract was so palpably illegal as to be void ab initio.  However, determining a contract to be illegal and void ab initio is a radical remedy to be approached with caution.  See Integrated Sys. Grp., Inc., GSBCA No. 14054-SSA, 1998 WL 377754 ("It is well established that a contract may be adjudged void ab initio where there exists the type of severe legal infirmity that would preclude the parties' exchange of promises from giving rise to an enforceable agreement.").  As the Federal Circuit stated in United States v. Amdahl Corporation:

> We are in agreement with the position of the Court of Claims that "the binding stamp of nullity" should be imposed only when the illegality of an award is "plain," John Reiner & Co. v. United States, 325 F.2d 438, 440 (163 Ct. Cl. 381) or "palpable," Warren Brothers Roads Co. v. United States, 355 F.2d 612, 615 (173 Ct. Cl. 714).  In determining whether an award is plainly or palpably illegal, we believe that if the award was made contrary to statutory or regulatory requirements because of some action or statement by the contractor (Prestex, Inc. v. United States, 320 F.2d 367 (162 Ct. Cl. 620), or if the contractor was on direct notice that the procedures being followed were violative of such requirements (Schoenbrod v. United States, 410 F.2d 400 (187 Ct. Cl. 627), then the award may be canceled without liability to the Government except to the extent recovery may be had on the basis of quantum meruit.  On the other hand, if the contractor did not contribute to the mistake resulting in the award and was not on direct notice before award that the procedures being followed were wrong, the award should not be considered plainly or palpably illegal, and the contract may only be terminated for the convenience of the Government.  John Reiner & Co. v. United

---

[9]  Mr. Kennedy testified that the buyer at the DSCC would have manually inserted the reference to Frequency in the Second Purchase Order, but the buyer did not testify.  Tr. 223-24.

States, *supra*; Brown & Son Electric Co. v. United States, 325 F.2d 446 (163 Ct. Cl. 465).

United States v. Amdahl Corp., 786 F.2d 387, 395 (Fed. Cir. 1986) (quoting To the Director, Defense Supply Agency, B–176393, 52 Comp. Gen. 215, 218 (1972)).

Here, the award was not made "contrary to statutory or regulatory requirements because of some action or statement by the contractor." Id. Plaintiff "did not contribute to the mistake resulting in the award and was not on direct notice before award that the procedures being followed were wrong . . . ." Id. Plaintiff initially had not responded to the withdrawn RFQ. Rather, the agency contacted Plaintiff, asked it to quote, and Melstrom did quote its own 112 Part; the agency issued a purchase order that listed Frequency in the description but did not specify that the "exact product" be provided, and Plaintiff reasonably assumed it could supply its own 112 part. The agency, however, did not want that part and did not believe it ordered that part. Under these circumstances, as in Amdahl and Reiner, the invocation of the termination for convenience remedy makes sense. It would be unfair to saddle the contractor with the costs of performance incurred under the flawed Purchase Order.

The termination for convenience clause was incorporated into the Second Purchase Order.[10] "A termination for convenience ordinarily entitles a contractor to recover its incurred costs of performance, reasonable termination expenses, and a reasonable profit on the work performed (or an offset to account for the contractor's expected losses had the contract been performed to completion)." Gen. Dynamics Corp. v. United States, 131 S. Ct. 1900, 1908 (2011). By agreement of the parties, this action was bifurcated as to liability and damages, and no proceedings have yet been conducted on damages. Plaintiff contends that it was 80 to 85% complete at the time of cancellation, and Plaintiff has the burden of proving the costs it incurred in the damages phase of this litigation.

### Defendant's Counterclaims

### Plaintiff Did Not Violate the False Claims Act

Defendant claims that Plaintiff violated the False Claims Act ("FCA"), 31 U.S.C § 3729 et seq., in two instances. First, Defendant asserts that Ulysses knowingly submitted a false quotation via DIBBS in order to obtain payment under a purchase order it was not eligible to

---

[10] All purchases made via DIBBS are governed by the DSCC's Master Solicitation agreement, and the Master Solicitation contains FAR 52.249-1, Termination for Convenience of the Government. See App. 120 (DLAD 13.101(b)(2)(91)(ii)); see also App. 125. Def.'s Resp. in Opp'n to Pl.'s Mot. for Summary J. and Cross-Mot. for Summary J. 9-10. The DSCC Master Solicitation for Automated Solicitations, which Defendant included in the appendix to its cross-motion for summary judgment, states that its provisions/clauses apply to automated solicitations with a "T" or a "U" in the ninth position of the solicitation number. Id., App. 380. The First RFQ, number SP0900-02-T-CB06, and the Second RFQ, number SP0900-02-T-K808, have "T's" in the ninth position and thus incorporate the terms of the Master Solicitation.

receive.   Second, Defendant contends Ulysses "fil[ed] a CDA claim that intentionally sought payment upon this fraudulently obtained purchase order and also asserted falsely that Ulysses was an approved manufacturer for the part at issue."   Def.'s Supplemental Post-Trial Br. 2.[11] Defendant's request for relief under the FCA is limited to the penalties authorized by the FCA. See Am. Answer to Pl.'s First Am. Compl. and Def.'s Counterclaims ¶ 86.

To establish that a plaintiff is liable under the False Claims Act, the Government must show that (1) the contractor presented a claim for payment, (2) the claim was false or fraudulent, (3) the contractor knew that the claim was false or fraudulent, and (4) the Government suffered damages because of the false or fraudulent claim.  31 U.S.C. § 3729 (2000); Young-Montenay, Inc. v. United States, 15 F.3d 1040, 1043 (Fed. Cir. 1994).   The Government must prove the elements of an FCA claim by a preponderance of the evidence.  31 U.S.C. § 3731(c) (2000).

**The DIBBS Quotation Is Not a Claim**

In the context at issue here, the FCA defines a "claim" as follows:

(c) Claim defined.--For purposes of this section, "claim" includes any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

31 U.S.C. § 3729(c) (2000).

Ulysses did not violate the FCA when it submitted its electronic quotation in response to the First RFQ because the submission of a quotation is not a claim -- the quotation is not a request or demand for money or property.   Ulysses was responding to DSCC's RFQ -- not presenting a claim for payment as required by the FCA.   By submitting a quote to supply a product at a given price, Plaintiff was not asking the Government for money.   Only after the Government accepted the quote, and the contractor delivered the product, would the contractor be presenting a claim by submitting an invoice or otherwise seeking payment.   Plaintiff never got that far by merely submitting a quotation.   The disputes about whether Plaintiff had to supply a Raytheon part or was an approved source to manufacture its own part were not resolved prior to cancellation.   Plaintiff never supplied any parts and never submitted an invoice for its 112 Parts covered by the First Purchase Order.

"The False Claims Act seeks to redress fraudulent activity which attempts to or actually causes economic loss to the United States government. . . .   It was not intended to impose liability for every false statement made to the government."   Hutchins v. Wilentz, Goldman & Sptizer, 253 F.3d 176, 184 (3d Cir. 2001); see also United States v. McNinch, 356 U.S. 595, 598

---

[11]   Defendant does not contend that Plaintiff violated the FCA by virtue of its conduct related to the Second Purchase Order.

(1958) (holding that an application for credit insurance under a Federal Housing Administration program did not constitute a claim under the FCA); United States v. Southland Mgmt. Corp., 326 F.3d 669, 674-75 (5th Cir. 2003) (en banc) ("It is only those claims for money or property to which a defendant is not entitled that are 'false' for purposes of the False Claims Act."); United States v. Rivera, 55 F.3d 703, 709 (1st Cir. 1995) ("[T]he statute attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the 'claim for payment.'"); Kellogg Brown & Root Servs., Inc. v. United States, 99 Fed. Cl. 488, 513 (2011), appeal docketed, No. 2012-5106 (Fed. Cir. July 10, 2012) ("[F]raudulent schemes are not actionable under the FCA unless a false claim for payment results.").

In the classic FCA scenario, a contractor asks the Government for a payment which it is not entitled to receive.  For example, in Young-Montenay, the Federal Circuit found an FCA violation when a contractor's employee altered an invoice to seek from the Government $49,000 over the actual cost of the work performed. 15 F.3d at 1042.  The Young-Montenay invoice was clearly a demand for payment from the Government, unlike Ulysses' quotation, which was an offer to supply a quantity of 112 Parts at a price of $44,625 -- an offer the Government could take or leave.  Ulysses' quote was not a "demand" for money "presented to an officer, employee, or agent of the United States." 31 U.S.C. § 3729.

Even if Ulysses' quotation could somehow be viewed as a claim under the FCA, Defendant failed to prove that Plaintiff knew that its quotation was false or fraudulent.  "For purposes of the FCA, a contractor is deemed to have known that a claim it submitted was false if it had actual knowledge of the falsity of the claim or if it acted in deliberate ignorance or reckless disregard of the truth or falsity of its claim." Commercial Contractors, Inc. v. United States, 154 F.3d 1357, 1362 (Fed. Cir. 1998) (citing 31 U.S.C. § 3729(b)).  "However, 'innocent mistakes and negligence are not offenses under the Act.'"  United States ex rel. Quirk v. Madonna Towers, Inc., 278 F.3d 765, 767 (8th Cir. 2002) (quoting United States ex rel. Oliver v. Parsons Co., 195 F.3d 457, 464-65 (9th Cir. 1999)).

Defendant argues that Ulysses knowingly submitted a false quote to provide 112 Parts made by or under the direction of Raytheon, stating:

> The evidence and testimony showed that Ulysses submitted a quotation electronically in response to the First RFQ.  DX22; DX 23; Tr. 276:16-277:14; Tr. 285:10-286:12; Tr. 318:8-319:23.  In that quotation, Ulysses indicated that it was submitting a bid without exception, and identified the product that Ulysses intended to supply as CAGE 072E5 P/N 178AS112, *i.e.*, a '112 part made by or under the direction of Raytheon. DX22 at 2; Tr. 275:9-276:8; Tr. 286:22-287:1.  In fact, this representation was false. Ulysses had no intention to supply a '112 part made by or at the direction of Raytheon; rather, it intended to supply products of its own manufacture. *See* Tr. 219:24-220:4; Tr. 222:7-12; Tr. 225:7-10; *see also, e.g.*, PX 11, PX 14, JX 11, PX 18, PX 28.

> The evidence at trial demonstrated that Ulysses's misrepresentation was made knowingly within the meaning of the FCA, and was not the product of an

innocent mistake in using the Government's DIBBS system.  First, in order to convey to the Government that it intended to supply a part made by or under the direction of Raytheon, Ulysses affirmatively indicated that it was submitting a bid without exception, and then availed itself of a drop down menu of approved sources from which it specifically identified the product that it purportedly intended to supply.  DX22 at 2; Tr. 275:9-276:8; Tr. 286:22-287:1.  That part was CAGE 072E5 P/N 178AS112, *i.e.*, a '112 part made by or at the direction of Raytheon. DX22; Tr. 286:22-287:1.

Def.'s Post-Trial Br. 24.

The record does not support a finding that Ulysses had actual knowledge its electronic quotation for the Raytheon part was false.  While the electronic quotation screens in DIBBS did contain a notice that the exact product quoted, i.e., the Raytheon part, had to be provided, the Government failed to adduce any evidence that Mr. Tsoutsas or any employee of Ulysses actually read the notice, understood what that DIBBS notice meant, and intentionally falsified its quote by misrepresenting that it was going to provide the exact Raytheon part.  Mr. Tsoutsas disavowed any involvement with the electronic quotation, and the Government did not prove he submitted it.  The record suggests that his secretary submitted it, but Defendant did not call the secretary as a witness to confirm or deny this.

Further, the record supports finding that Mr. Tsoutsas did not believe Plaintiff had to supply the Raytheon part because of his interpretation of the First Purchase Order and his companies' prior supply of the 112 Part as a component of the 100 Part with the Government's acceptance.  As explained below, the First Purchase Order and the RFQ that gave rise to it were not models of clarity.  The evidence indicates that Mr. Tsoutsas believed Ulysses was complying with the purchase order by manufacturing the 112 Part itself -- not that Ulysses intentionally bid the Raytheon part all the while intending to substitute its own part for Raytheon's.

The Government contends that Ulysses demonstrated reckless disregard of the truth or falsity of its claim because its interpretation of the Purchase Order bordered on the frivolous.  In Commercial Contractors, the Federal Circuit ruled that a contractor acted in reckless disregard of whether its claims for payments were false because its interpretation of the contract was so implausible it "border[ed] on the frivolous."  154 F.3d at 1366.  The plaintiff in Commercial Contractors argued that its claims concerning the amount of excavation it performed were not false because its interpretation of the contract was reasonable, it did not evidence intent to defraud the Government, and it disclosed its method of calculating the work performed to the agency.  Id. at 1363-64.  The Federal Circuit rejected the plaintiff's argument, stating:

If a contractor submits a claim based on a plausible but erroneous contract interpretation, the contractor will not be liable, absent some specific evidence of knowledge that the claim is false or of intent to deceive.  Yet when a contractor adopts a contract interpretation that is implausible in light of the unambiguous terms of the contract and other evidence (such as repeated warnings from a subcontractor or the fact that the interpretation is contrary to well-established

industry practice), the contractor may be liable under the FCA or the CDA even in the absence of any deliberate concealment or misstatement of facts. Under such circumstances, when the contractor's purported interpretation of the contract borders on the frivolous, the contractor must either raise the interpretation issue with the government contracting officials or risk liability under the FCA or the CDA.

Id. at 1366.

Here, Plaintiff's interpretation of the First Purchase Order did not border on the frivolous. The Request for Quotation that gave rise to the purchase order did not clearly state what the manufacturing or "approved source" requirements for the 112 Part were. The item description in the First RFQ contained 29 lines detailing a prohibition against using "any class 1 ozone-depleting substance" in processing the item, and recommending that a particular Mil spec be utilized for printed circuit or wiring boards and that laminate materials be equivalent "in quality and reliability to that which was available prior to the cancellation of MIL-S-13949 on November 30, 1998." DX 1. Immediately following the prohibition and recommendations -- without any paragraph or spacing break -- was the following list:

ABRAMS INSTRUMENT CORP.               00048 P/N 178AS112
RAYTHEON TECHNICAL SERVICES CO         072E5 P/N 178AS112
TECHNICAL SERVICES LABORATORY INC      51283 P/N/178AS112

DX 1. There was no heading or lead-in sentence suggesting why these companies were listed immediately following the prohibition against ozone-depleting substances and recommendations on a Mil spec for circuit boards and the qualifications for laminates. Nor was there an express indication that the 112 Parts manufactured by these three companies were the only products that could be supplied. The phrase "approved source" was nowhere in the RFQ.

As the Sixth Circuit recognized in United States v. Renal Care Group, Inc., where a claimant's obligations are not clear and the claimant candidly apprises the Government of its interpretations of its claim, it is inappropriate to find that the claimant acted with reckless disregard for the truth or falsity of such claim. 696 F.3d 518, 522-23 (6th Cir. 2012). The Court explained:

[T]he defendants were not in reckless disregard of the truth or falsity of their claims. Rather, they consistently sought clarification on the issue, followed industry practice in trying to sort through ambiguous regulations, and were forthright with government officials over [the subsidiary's] structure. To deem such behavior "reckless disregard" of controlling statutes and regulations imposes a burden on government contractors far higher than what Congress intended when it passed 31 U.S.C. § 3729(b)(1)(A)(iii).

Id. at 531. Given the cryptic language and structure of the RFQ, Mr. Tsoutsas' interpretation that a contractor could manufacture its own 112 Part was not so implausible as to be frivolous. So too, while the Purchase Order referenced Raytheon's CAGE Code, Mr. Tsoutsas credibly

testified that he interpreted that reference to reflect the history of procurements for the 112 Part and not to mean that Ulysses had to supply the Raytheon part -- which would have cost much more.  Tr. 91-92.  Consistently citing this interpretation, Mr. Tsoutsas clearly advised the Government all along that Ulysses never intended to provide the Raytheon 112 Part.  See PX 11, 14, 18, 28; JX 7, 11, 15, 16, 17.

### Submission of the CDA Claim

Defendant also alleges that Plaintiff violated the FCA when it submitted its CDA claim. In the claim, Mr. Tsoutsas asserted the Government wrongfully canceled the purchase orders and that Ulysses was entitled to the total contract amount -- $95,115.    In the claim, Mr. Tsoutsas stated: "Ulysses has always been considered as an approved source for P/N 178AS112 and the final component P/N 178AS100.   If Ulysses was in fact not an approved source for parts 178AS112, and P/N 178AS100, the agency had waived the requirement in the past."  PX 28.  He continued: "[t]he government failed to exercise proper discretion and inspect and perform First Article testing on the part . . . ."  PX 28.  Ulysses requested the following relief:

1.  Issue a determination that the Agency should accept Part 178AS112 as Ulysses is an approved source and pay Ulysses the total contract amount for Contract 4209 for a value of $44,625.00.

2.  Issue a determination that the Agency should accept Part 178AS112 as Ulysses is an approved source and pay Ulysses the total contract amount for Contract 5456 for the production of ninety-nine units of this identical item for a total value of $50,490.00.

3.  Issue a determination that if Ulysses is not on the agency's approved source list then by allowing Ulysses to provide these parts in the past, the government has waived the requirement for Ulysses to be on the approved source list and should pay Ulysses the total contract amount for Contract 4209 and 5456 totaling $95,115.00.

PX 28.

Defendant argues that Plaintiff's CDA claim violated the False Claim Act, stating:

Ulysses sought payment in its certified claim pursuant to purchase orders to which it knew that it was not entitled.  Specifically, Ulysses knew that it had obtained at least the First Purchase Order by fraud, by intentionally misrepresenting in its quotation that Ulysses both intended and could supply a '112 part made by or under the direction of Raytheon. In addition, as demonstrated by Mr. Tsoutsas's tortured and implausible attempts to explain away after the fact the plain language of the purchase orders at issue, Ulysses also knew that the purchase orders called for products that Ulysses did not, and could not, supply.   As such, Ulysses's certified claim was fraudulent within the meaning of the FCA from its inception.

Def.'s Post-Trial Br. 26. Plaintiff's CDA claim qualifies as a demand for payment as the claim sought payment for the full amount of its two unperformed purchase orders -- $95,115. PX 28. However, Defendant's counterclaim fails because Defendant failed to prove that Plaintiff's CDA claim was factually false. Rather, Plaintiff asserted a different interpretation of the requirements of the First Purchase Order than the Government. So too, Ulysses argued in its claim that by accepting its 112 Parts as components of its 100 Parts, the Government had waived the approved source requirement in the past -- a legal position not a factual representation. Plaintiff informed the Government of its legal position in writing several times. See PX 11, 14, 18; JX 11, 15, 16, 17. As evidenced in the communications between Mr. Tsoutsas and Mr. Kennedy, Mr. Tsoutsas was convinced that Ulysses was an approved source and could provide self-manufactured 112 Parts under both purchase orders. Indeed, Mr. Tsoutsas' agitated demeanor during his testimony exhibited his frustration with the Government's failure to recognize his company as an approved source -- a conclusion he apparently thought was obvious.

Plaintiff's interpretation was in essence a legal call about what would meet the requirements of the Purchase Orders. In the case of the First Purchase Order, Plaintiff determined that it could manufacture the 112 Part itself and was not obligated to supply the 112 Part manufactured by Raytheon. Plaintiff's belief that it could do this was wrong, but it was not a false claim predicated on a falsification or misrepresentation of a fact. Plaintiff demonstrated that it had no intention of providing the Raytheon part -- because of its interpretation of its quote, the Purchase Order's requirements, and its view that it was an approved source to manufacture the part itself. The parties' course of dealing -- in particular, Mr. Tsoutsas' extensive correspondence with Mr. Kennedy -- bears out Plaintiff's position, and Defendant has marshaled no proof that Plaintiff intended to bid the Raytheon part, falsified its bid, and intended to substitute its own product. Rather, the record indicates that Plaintiff intended to (and thought that it did) bid its own 112 Part all along.

There is even less of a case for the Government's assertion that Plaintiff's CDA claim was false with respect to the Second Purchase Order. In that instance, the Government was insisting on receiving a product it did not list in the RFQ and a product that Plaintiff never quoted. Plaintiff's claim for payment under the Second Purchase Order was in no way factually false -- it never said it would provide a Frequency part.

**The Government Knowledge Defense**

Additionally, Plaintiff contends that it is not liable under the FCA, relying on the "Government knowledge" defense. The Federal Circuit has not addressed the Government knowledge defense, but the Second, Fourth, Seventh, Ninth, and Tenth Circuits have. See United States ex rel. Becker v. Westinghouse Savannah River Co., 305 F.3d 284, 289 (4th Cir. 2002); Shaw v. AAA Eng'g & Drafting, Inc., 213 F.3d 519, 534 (10th Cir. 2000); United States ex rel. Durcholz v. FKW Inc., 189 F.3d 542, 544-45 (7th Cir. 1999); United States ex rel. Kreindler & Kreindler v. United Techs. Corp., 985 F.2d 1148, 1157 (2d Cir. 1993); United States ex rel. Hagood v. Sonoma Cnty. Water Agency, 929 F.2d 1416, 1421 (9th Cir. 1991); see also Chemray Coatings Corp. v. United States, 29 Fed. Cl. 278, 284 (1993) (stating Government

knowledge is relevant for purposes of determining whether a contractor knowingly made a false or fraudulent statement).

Under the Government knowledge defense, prior Government knowledge of an allegedly false claim may negate the FCA's scienter requirement.  Becker, 305 F.3d at 289; see also Durcholz, 189 F.3d at 544-45; Neal J. Wilson, The Government Knowledge "Defense" to Civil False Claims Actions, 24 PUB. CONT. L.J. 43, 45-46 (1994) ("The defense is premised upon the argument that a claim cannot be 'false' within the meaning of the Act where it can be shown that the Government has been told the 'truth' about its basis.").  This defense applies to the Government's knowledge at the time the claim underlying the FCA action was submitted.  See United States ex rel. Burlbaw v. Orenduff, 548 F.3d 931, 952 (10th Cir. 2008) (stating the defense arises when the Government knew of the facts before presentment of the claim); United States v. Southland Mgmt. Corp., 288 F.3d at 685-86 (5th Cir. 2002) (explaining the mens rea requirement of the FCA and the Government knowledge defense are implicated when the false claim is submitted), rev'd and vacated on other grounds, 326 F.3d 669 (5th Cir. 2003).

The Government knowledge defense is rooted in the pre-1986 versions of the FCA, which provided: "[t]he court shall have no jurisdiction to proceed with any [FCA] suit . . . whenever it shall be made to appear that such suit was based upon evidence or information in the possession of the United States, or any agency, officer, or employee thereof, at the time such suit was brought . . . ." 31 U.S.C. § 232(C) (1976).[12]  The Fourth Circuit explained the rationale for the defense as follows:

> Evidence that the government knew about the facts underlying an allegedly false claim can serve to distinguish between the knowing submission of a false claim, which generally is actionable under the FCA, and the submission of a claim that turned out to be incorrect, which generally is not actionable under the FCA.  That is, "the government's knowledge of the facts underlying an allegedly false record or statement can negate the scienter required for an FCA violation."

United States ex rel. Ubl v. IIF Data Solutions, 650 F.3d 445, 452 (4th Cir. 2011) cert. denied, 132 S. Ct. 526 (2011) (quoting Becker, 305 F.3d at 289).

The Government knowledge defense provides an additional basis to find that Plaintiff is not liable under the FCA because the Government knew the particulars of Plaintiff's CDA claim before it was presented.  The Government articulated its FCA claim as follows:

> Ulysses sought payment in its certified claim pursuant to purchase orders to which it knew that it was not entitled.  Specifically, Ulysses knew that it had obtained at least the First Purchase Order by fraud, by intentionally misrepresenting in its quotation that Ulysses both intended and could supply a '112 part made by or under the direction of Raytheon. In addition, as demonstrated by Mr. Tsoutsas's

_____

[12]  Although § 232(C) referred to the filing of an FCA suit, courts applying the Government knowledge defense look to the time of the filing of the record, claim, or statement underlying the FCA claim.

34

tortured and implausible attempts to explain away after the fact the plain language of the purchase orders at issue, Ulysses also knew that the purchase orders called for products that Ulysses did not, and could not, supply. As such, Ulysses's certified claim was fraudulent within the meaning of the FCA from its inception.

Def.'s Post-Trial Br. 26. As explained above, the evidence does not support a finding either that Ulysses knew that the purchase orders required Raytheon and Frequency parts, or that Ulysses misrepresented that it would supply Raytheon and Frequency parts. When Ulysses filed its CDA claim in 2006, the Government was well aware of Ulysses' view that it was an approved source because it had provided the 100 Part and the 114 Parts to the Government. Mr. Tsoutsas had informed the Government of his position in writing numerous times between 2002 and 2006, prior to submitting Ulysses' CDA claim on February 16, 2006, as follows:

- "The information provided should give you enough confidence that if we are able to produce the [100 Part], which is by far a much more complicated assembly than the subject item and which is part of the equipment, we should be able to perform the subject contracts." PX 11.

- "[W]e submitted to you documentation indicating that we are the manufacturer of the subject contract items as well as the next higher assembly, which is the equipment itself . . . ." PX 14.

- "Ulysses is not making alternate parts, and again the parts that we are making are in accordance with military drawings, specifications, and standards." JX 11.

- "As we indicated in previous correspondence we are the manufacturer of the equipment itself which is a lot more complicated and requires a considerable amount of knowledge to manufacture and test it." PX 18.

- "The item on these contracts is a circuit board assembly which is a component of the test equipment P/N 178AS100 which we have successfully manufactured . . . . We also have manufactured for the Government an almost identical circuit board assembly P/N 178AS114 . . . ." JX 16.

- "[W]e clearly indicated that we have manufactured the next higher assembly, which is the equipment itself and which obviously qualifies us to make the subject item.
  We also provided you with information concerning another part number which goes into the same equipment and which is almost identical to the subject item and which was provided to the Government without any discrepancies . . . ." JX 15.

- "In addition to the above we attach an abstract of procurement history on the next higher assembly which is the overall equipment P/N 178AS100. . . . Also attached herewith is an abstract for P/N 178AS114, which is almost identical to subject item P/N 178AS112." JX 17.

Because the Government was well aware of Plaintiff's position that it was going to manufacture the parts itself as early as August 2002, and continuing throughout the parties' course of dealing, the Government failed to prove that Ulysses knowingly misrepresented that it was going to supply Raytheon or Frequency parts.  See Ubl, 650 F.3d at 452; Wang v. FMC Corp., 975 F.2d 1412, 1421 (9th Cir. 1992) ("The fact that the government knew of FMC's mistakes and limitations, and that FMC was open with the government about them, suggests that while FMC might have been groping for solutions, it was not cheating the government in the effort."), abrogated on other grounds, Rockwell Int'l Corp. v. United States, 549 U.S. 457, 468 (2007).

Ulysses candidly advised the Government of its position that it believed it was an approved source, capable of manufacturing the part itself and did not attempt to deceive or mislead the Government in representing its status.  The Government knew that Ulysses had not gone through the Source Approval Request process because Ulysses told it so.  Further, Ulysses persisted in arguing that it should not have had to undergo this process because it had already manufactured the 112 Part for the Government as a component of a larger part.  Ulysses' effort to have the Government test its 112 Part is further evidence that it believed it deserved to be an approved source in its own right -- not that it was attempting to pass off its product as a Raytheon or Frequency part.  Ulysses told the Government the truth about its status, making this a classic case for application of the Government knowledge defense.

**Plaintiff Did Not Forfeit Its Claim Under the CDA's Fraud Provision**

Defendant also asserted that Plaintiff's claims should be forfeited under the CDA's fraud provision because in submitting its CDA claim, Ulysses "repeatedly and falsely asserted that it was an approved source for the '112 part, and sought payment under purchase orders to which it knew that it was not entitled, with the intent to deceive or mislead the Government."  Def.'s Post-Trial. Br. 30.  The CDA's fraud provision provides:

> If a contractor is unable to support any part of his claim and it is determined that such inability is attributable to misrepresentation of fact or fraud on the part of the contractor, he shall be liable to the Government for an amount equal to such unsupported part of the claim in addition to all costs to the Government attributable to the cost of reviewing said part of his claim.

41 U.S.C. § 604 (2000).

A contractor is liable under the antifraud provision of the CDA when the "'contractor is unable to support any part of his claim and it is determined that such inability is attributable to misrepresentation of fact or fraud on the part of the contractor . . . .'"  Daewoo Eng'g & Constr. Co. v. United States, 557 F.3d 1332, 1335 (Fed. Cir. 2009) (quoting 41 U.S.C. § 604).  "A 'misrepresentation of fact' is 'a false statement of substantive fact, or any conduct which leads to a belief of a substantive fact material to proper understanding of the matter in hand, made with intent to deceive or mislead.'"  Id. (quoting 41 U.S.C. § 601(9)).  While the CDA does not provide a standard of proof, the Federal Circuit has applied the "preponderance of the evidence"

standard to claims brought under the CDA's fraud provision.  Commercial Contractors, Inc. v. United States, 154 F.3d 1357, 1362 (Fed. Cir. 1998); Grand Acadian, Inc. v. United States, 105 Fed. Cl. 447, 457-58 (2012).  To prevail under this provision of the CDA, the Government must prove that the plaintiff made false or fraudulent statements in its claim and submitted the claim with the intent to deceive or mislead.  41 U.S.C. § 601(7) (2000); Young-Montenay, Inc. v. United States, 15 F.3d 1040, 1042-43 (Fed. Cir. 1994) (finding that the plaintiff contractor forfeited its claim when the contractor had invoiced the Government for $49,000 over its actual costs); UMC Elecs. Co. v. United States, 43 Fed. Cl. 776, 820-21 (1999), aff'd, 249 F.3d 1337, 1340 (Fed. Cir. 2001).

Contrary to Defendant's contentions, Ulysses' assertion that it was an approved source to produce the 112 Part was not a false assertion made with intent to deceive or mislead the Government.  The concept of what constituted an approved source was murky.  The differences of opinion between Plaintiff and Defendant about whether Ulysses was an approved source stem from the parties' different understandings of what it took to become an approved source.  Mr. Tsoutsas believed his company was an approved source by virtue of its having supplied the item to the Government before as a component of the 100 Part.  The Government's witness, Mr. Kennedy, was of the view that an entity had to submit a Source Approval Request and undergo a process that he explained as follows:

> Well, from my knowledge, there would be some sort of data collection, tests, whatever it is, whatever the technical requirements are, that data package is collected and sent to the service activity, whether it's the Army, Navy, Air Force, Marines, whoever is in control of the item, and at that point that engineer support activity -- Army, Navy, Air [F]orce, Marines, whoever it is -- makes the decision whether that company is an approved or unapproved source.

Tr. 205.

The record establishes that Plaintiff submitted a claim believing it was qualified to manufacture the 112 Part based on a different interpretation of what constituted an approved source.  Plaintiff's position was not the product of any false statement of fact or misrepresentation, but was its interpretation of the approved source requirement based upon its prior dealings with the Government.  Defendant has not proven that Plaintiff's CDA claim should be forfeited.

## **Defendant Failed to Prove that Plaintiff Committed Fraud in the "Proof, Statement, Establishment, or Allowance" of Its Claim As Required under the FFCA**

Defendant contends that Plaintiff's claims should be forfeited pursuant to the Forfeiture of Fraudulent Claims Act ("FFCA") because Plaintiff committed fraud when it obtained the First Purchase Order by claiming that it would provide 112 Parts manufactured by Raytheon and when it claimed to be an approved source for the 112 Part in its CDA claim.  Specifically, Defendant asserts:

37

> Ulysses made false claims and practiced fraud against the United States both: (a) when Ulysses claimed to have been an approved manufacturer to obtain the two purchase orders; and (b) when Ulysses presented its certified claim to the contracting officer with the intent to cause the Government to pay Ulysses amounts to which it knows it is not entitled.

Am. Answer ¶ 88. Thus, Defendant contends that Ulysses violated the FFCA when it submitted its quotations in 2002, and when it submitted its CDA claim in 2006.

> The FFCA provides:

> A claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof. In such cases the United States Court of Federal Claims shall specifically find such fraud or attempt and render judgment of forfeiture.

28 U.S.C. § 2514 (2000). The Federal Circuit has held that, to prevail on a counterclaim alleging fraud under the FFCA, the Government is required to "'establish by clear and convincing evidence that the contractor knew that its submitted claims were false, and that it intended to defraud the government by submitting those claims.'"  Daewoo Eng'g, 557 F.3d at 1341 (quoting Commercial Contractors, 154 F.3d at 1362). Proof of negligence or ineptitude does not meet the standard of clear and convincing evidence; rather, "[a]n intent to deceive the Government must be proved." Miller v. United States, 213 Ct. Cl. 59, 68-69 (1977).

Defendant asserts that Ulysses' claim should be forfeited under the FFCA because it misrepresented itself as an approved source for the 112 Part when it obtained the purchase orders. Defendant's counterclaim is based on the notion that a claim is subject to forfeiture under the FFCA if the contactor practiced fraud in the formation or performance of a contract. See Am. Heritage Bancorp v. United States, 61 Fed. Cl. 376, 388-89 (2004) ("[A] party that fraudulently induces the government into entering a contract cannot claim damages based on the government's breach of contract."); Supermex, Inc. v. United States, 35 Fed. Cl. 29, 40 (1996) ("The effects of the fraudulent act, therefore, had an effect on every aspect of contract performance, making it virtually impossible to distinguish between tainted and untainted claims."); Brown Constr. Trades, Inc. v. United States, 23 Cl. Ct. 214, 215-16 (1991) ("[C]orruption in the administration of the contract engenders a suspicion about the integrity of the entire course of dealing. Only through the remedy of nonenforcement can the procurement system free itself of the suspicion of frauds gone undetected."). However, such an expansive reading of the FFCA is not warranted by the language of the statute.

In Kellogg Brown & Root Services, Inc. v. United States ("KBR"), the Court emphasized that the FFCA is "limited to circumstances where the Government proves fraud 'in the proof, statement, establishment, or allowance' of a claim." 99 Fed. Cl. 488, 497 (2011) (quoting 28 U.S.C. § 2514), appeal docketed, No. 2012-5106 (Fed. Cir. July 10, 2012); see also Veridyne Corp. v. United States, 83 Fed. Cl. 575, 586 (2008) ("The statutory language has been construed

as proscribing fraud in the prosecution of claims against the United States, not fraud in the performance of the contract."). The <u>KBR</u> Court explained:

> Not only does this expansion depart from Court of Claims precedent, it does not comport with the Federal Circuit's articulation of the legal requirement of the forfeiture statute: to prevail on a counterclaim alleging fraud under 28 U.S.C. § 2514, defendant "'is required to establish by clear and convincing evidence that the contractor *knew that its submitted claims were false*, and that it intended to defraud the government by *submitting* those claims.'" *Glendale Fed. Bank*, 239 F.3d at 1379 (emphasis added) (quoting *Commercial Contractors*, 154 F.3d at 1362). Defendant pushes the boundaries of the forfeiture statute's applicability. A valid cause of action under that statute must be tied to the submission of a claim, whether in producing false proof to support a claim, *see, e.g.*, *Kamen Soap*, 124 F. Supp. at 622 (forfeiting claim because falsified documentation was submitted in presentation of claim), or in falsely establishing the claim, *see, e.g.*, *N.Y. Mkt.*, 43 Ct. Cl. at 136 (Government's objection to claim based on contractor's not fulfilling contract specifications, i.e., "establishment" of a false claim).

99 Fed. Cl. at 501. In the view of this Court, the <u>KBR</u> Court correctly concluded that fraudulent conduct must occur in "the proof, statement, establishment, or allowance" of a claim to be subject to forfeiture under the plain language of the FFCA. As such, Defendant's request for forfeiture based upon Ulysses' conduct in obtaining the purchase orders by characterizing itself as an approved source must fail. Ulysses' actions in securing the purchase orders were not connected with its later separate action of submitting its CDA claim; the statement in the purchase orders did not occur in "the proof, statement, establishment, or allowance" of a claim.

In seeking forfeiture of Plaintiff's CDA claim, Defendant also posits that "Ulysses presented its certified claim to the contracting officer with the intent to cause the Government to pay Ulysses amounts to which it knows it is not entitled." Am. Answer ¶ 88. While this alleged fraudulent conduct is tied directly to Plaintiff's CDA claim, Defendant has not established by clear and convincing evidence either that Ulysses knew that its CDA claim was false or that Ulysses intended to defraud the Government by submitting its CDA claim. Rather, as explained above, in its CDA claim, Ulysses recognized that the Government did not deem Ulysses an approved source but disagreed with that legal interpretation and continued to press its position that it should be recognized as an approved source. Throughout this saga and in its CDA claim, Ulysses contended it qualified as an approved source because it had manufactured the 112 Part as a component of a larger part with the Government's acceptance. Ulysses' action in pressing its interpretation of the term "approved source" and advocating it qualified as such a source is a far cry from either intentionally falsifying a claim or submitting a claim with the intent to defraud the Government.

### Conclusion

1.      Defendant legally canceled the First Purchase Order at no cost to the Government. Accordingly, the Clerk is directed to enter judgment in favor of Defendant on Plaintiff's claims under the First Purchase Order.  Plaintiff's claims for recovery of $ 44,625 and for reformation are **DENIED**.

2.      Defendant's no-cost cancellation of the Second Purchase Order is converted to a termination for convenience.  Plaintiff may be entitled to recover termination for convenience damages, if it can demonstrate its damages in further proceedings.

3.      Defendant's counterclaims are **DENIED.**

4.      The parties shall file a joint status report on or before **May 15, 2013**, proposing a schedule for the damages phase of this ligation.

s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Judge**