# In the United States Court of Federal Claims

No. 06-436C
(Filed: August 7, 2014)

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * * * | * | |
| | * | |
| **ULYSSES INC.,** | * | |
| | * | Equal Access to Justice Act, 29 U.S.C. |
| Plaintiff, | * | § 2412; Substantial Justification; |
| | * | Government Counterclaims; False |
| v. | * | Claims Act, 31 U.S.C. § 3729(c) |
| | * | (2000); Contract Disputes Act Fraud |
| **THE UNITED STATES,** | * | Provision, 41 U.S.C. § 604 (2000); |
| | * | Forfeiture of Fraudulent Claims Act, |
| Defendant. | * | 28 U.S.C. § 2514 (2000). |
| | * | |
| * * * * * * * * * * * * * * * * * * * * * * * * * | | |

Cyrus E. Phillips IV, Albo & Oblon, L.L.P. Courthouse Plaza, 2200 Clarendon Boulevard, Suite 1201, Arlington, 22201, Virginia, for Plaintiff.

Stuart F. Delery, Bryant G. Snee, Deborah A. Bynum, and A. Bondurant Eley, United States Department of Justice, Commercial Litigation Branch, Civil Division, P.O. Box 480, Ben Franklin Station, Washington, D.C., 20044, for Defendant.

**OPINION AND ORDER**

**WILLIAMS**, Judge

This matter comes before the Court on Plaintiff's application for an award of attorney's fees and expenses pursuant to the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412 (2012). In the underlying action, Plaintiff prevailed in establishing that the Government improperly canceled one of two purchase orders and successfully defended against the Government's counterclaims invoking the False Claims Act ("FCA"), the fraud provision of the Contract Disputes Act ("CDA"), and the Forfeiture of Fraudulent Claims Act ("FFCA").

The Government opposes Plaintiff's motion for attorney's fees and costs, arguing that its position in the matter was "substantially justified" and an award under EAJA is therefore precluded. Under EAJA, the Court shall award fees to the prevailing party unless the Government's position in the matter was substantially justified. Because the Government has not established that its position was substantially justified, Plaintiff is entitled to an award of attorney's fees and other expenses.

**Background**

Plaintiff, Ulysses, Inc., ("Ulysses") was a manufacturer of electronic equipment, transmitter receivers, and cable and mechanical assemblies. From 1962 until this contractual relationship, 60% of Ulysses' sales were made to the United States Government. Ulysses v. United States, 110 Fed. Cl. 618, 623 (2013). On two separate occasions in March and June of 2002, the Government through the Defense Supply Center Columbus ("DSCC") issued Requests for Quotation ("RFQ"), soliciting bids for P/N 178AS112 ("112 Part"). Id. at 626, 630.

Plaintiff's President, Demetrios Tsoutsas, understood that Plaintiff was an "approved source" of the 112 Part because it had successfully provided the 100 Part to the Government in the past and the 112 Part is a component of the 100 Part. Id. at 626. Plaintiff had also previously supplied the 114 Part, a more complicated component. Id. Believing that it would be able to manufacture the 112 Part itself, Plaintiff submitted bids in response to the Government's RFQs. Id. at 626-27. The Government subsequently issued two purchase orders to Plaintiff to supply the 112 Part. Id. at 629.

Under the first RFQ and first purchase order, the Government requested that Plaintiff provide "an exact product" manufactured by or under the direction of Raytheon. Id. at 624-31. The second RFQ did not include the name of a manufacturer, but the second purchase order specified that the 112 Part be manufactured by Frequency Selective Networks, Inc., a requirement that "came out of nowhere." Id. at 630-31, 639.

While Plaintiff was working to fulfill its obligations under the purchase orders, Brian Kennedy, the post-award administrator at DSCC, learned that Plaintiff intended to deliver 112 Parts that it manufactured itself rather than 112 Parts made by or under the direction of Raytheon and Frequency. Mr. Kennedy contacted Mr. Tsoutsas and stated that he would issue a stop work order until Plaintiff provided technical data and documentation that Plaintiff was in fact an approved source for the 112 Part. Id. at 632. Unsatisfied with the information Mr. Tsoutsas provided, on June 17, 2003, DSCC, canceled both purchase orders at no cost to the Government. Id. at 634.

**Procedural History**

On February 16, 2006, Plaintiff submitted a certified CDA claim to the contracting officer challenging the cancellation of the purchase orders and seeking $95,115 for the total amounts of both purchase orders. The contracting officer denied Plaintiff's claim and, on April 7, 2006, issued a final decision concluding that Plaintiff did not provide 112 Parts manufactured by Raytheon or Frequency as the Government had requested. Id. at 635. Plaintiff filed a complaint in this Court, alleging that the Government's cancellation of the two purchase orders was improper. Id. Plaintiff claimed it was entitled to relief including reinstatement of the purchase orders or payment for full performance and declaratory relief that Plaintiff was an approved source for the 112 Part or that the Government waived this requirement. Id. In July 2007, the Government filed an amended answer, asserting counterclaims alleging that Plaintiff violated the False Claims Act, the fraud provision of the CDA, and the Forfeiture of Fraudulent

Claims Act in submitting its quotation in response to the first RFQ and its CDA claim.  Id at 635-36.[1]

This Court found that because Ulysses failed to provide 112 Parts manufactured by Raytheon, the Government "legally canceled the First Purchase Order, before it ever blossomed into a contract."  Id. at 637.  This Court also found that the Government improperly canceled its second purchase order, because "[a] contract arose when Ulysses substantially performed the Second Purchase Order" and "[P]laintiff reasonably believed it could supply its own part given the wording of Ulysses' quote which did not mention Frequency."  Id. at 639.  The Government's cancellation of the second purchase order was thus converted to a termination for convenience which "ordinarily entitles a contractor to recover its incurred costs of performance, reasonable termination expenses and a reasonable profit for the work performed (or an offset to account for the contractor's expected losses had the contract been performed to completion)."  Id. at 640 (quoting Gen. Dynamics Corp. v. United States,  131 S. Ct. 1900, 1908 (2011)).  The Court entered judgment in the amount of $39,780 for the Plaintiff.  The Court also denied Defendant's counterclaims, finding that Plaintiff was not liable under the FCA, FFCA, or the fraud provision of the CDA, because it did not "knowingly" make any misrepresentations to the Government and its erroneous interpretation of the Government's specifications was reasonable and did not "border on the frivolous."  Id. at 642-43.

## Discussion

The Equal Access to Justice Act provides that:

Unless expressly prohibited by statute, a court may award reasonable fees and expenses of attorneys, in addition to the costs which may be awarded pursuant to subsection (a), to the prevailing party in any civil action brought by or against the United States or any agency or any official of the United States acting in his or her official capacity in any court having jurisdiction of such action. The United States shall be liable for such fees and expenses to the same extent that any other party would be liable under the common law or under the terms of any statute which specifically provides for such an award.

---

[1] Trial in this matter was originally scheduled for August 2008, but resolution of this case was delayed several times at the request of both parties.  This matter was stayed from February 26, 2008, to September 8, 2008, and again from October 1, 2009, to April 15, 2010, at the request of the parties.  In addition, Plaintiff was represented by three different counsel over the course of this litigation.  After Plaintiff's first counsel withdrew effective September 8, 2008, and Plaintiff failed to obtain new counsel, the Court dismissed Plaintiff's claims.  Order of Partial Dismissal, Jan. 15, 2009.  Plaintiff subsequently obtained new counsel and filed a motion for reconsideration of the partial dismissal, which the Court granted.  After summary judgment briefing was completed, Plaintiff's second attorney moved to withdraw in May 2011, and the Court granted the motion.  Order, June 10, 2011.  Plaintiff's current counsel became counsel of record in August 2011, and the Court conducted trial in March 2012.  Ulysses v. United States, 110 Fed. Cl. 618, 635, n.6 (2013).

28 U.S.C. § 2412(b) (2012).  To be a qualifying party, eligible for an EAJA award, a party must be:

> (i) an individual whose net worth did not exceed $2,000,000 at the time the civil action was filed, or (ii) any owner of an unincorporated business, or any partnership, corporation, association, unit of local government, or organization, the net worth of which did not exceed $7,000,000 at the time the civil action was filed, and which had not more than 500 employees at the time the civil action was filed . . . .

Id. at § 2412(d)(2)(B).  Plaintiff is a qualifying corporate private party under § 2412(d)(2)(B)(ii), because on May 30, 2006, when this civil action was filed, Plaintiff's net worth was not more than $7,000,000 and it did not have 500 employees.  Pl.'s Mot. 2.

The Act requires the Court to award the prevailing party fees and other expenses incurred in a civil action brought by or against the United States unless the Court "finds that the position of the United States was substantially justified or that special circumstances make an award unjust."  Id. at § 2412(d)(1)(A).  A "prevailing party" is "'[a] party in whose favor a judgment is rendered, regardless of the amount of damages awarded.'"  Buckhannon Bd. and Care Home, Inc., v. W. Va. Dept. of Health and Human Res., 532 U.S. 598, 603 (2001) (quoting Black's Law Dictionary 1145 (7th ed. 1999)); Brickwood Contractors, Inc. v. United States, 288 F.3d 1371, 1377 (Fed. Cir. 2002).  To qualify as a prevailing party, a party must "secure a judgment on the merits or a court-ordered consent decree."  Buckhannon, 532 U.S. at 600.

No special circumstances exist that would make an award of fees unjust in this case.  The question before the Court is whether, in canceling its two contracts with Plaintiff, defending this litigation, and asserting affirmative defenses and counterclaims under the FCA, FFCA, and fraud provision of the CDA, the Government advanced a position that was substantially justified.  The Government has the burden of proving that its position was substantially justified.  Pierce v. Underwood, 487 U.S. 552, 575-76 (1988).  The Government's position is substantially justified if it is "'justified in substance or in the main' – that is, justified to a degree that could satisfy a reasonable person."  Id. at 565 (citations omitted).  "EAJA was not intended to be an automatic fee-shifting device in cases where the petitioner prevails . . . .  [S]ubstantial justification is [instead] to be decided case-by-case on the basis of the record."  Luciano Pisoni Fabbrica Accessori Instrumenti Musicali v. United States, 837 F.2d 465, 467 (Fed. Cir. 1988) (quoting Gavette v. Office of Pers. Mgmt., 808 F.2d 1456, 1467 (Fed. Cir. 1986) (en banc)).

In determining whether to award attorney's fees under EAJA, the Court looks to whether the Government's position prior to and throughout litigation had a "reasonable basis in both law and fact."  Chiu v. United States, 948 F.2d 711, 715 (Fed. Cir. 1991).  While the appropriateness of the Government's position might vary on individual matters, the Court considers the totality of circumstances to determine whether that position was "substantially justified."  In the words of the United States Supreme Court, "While the parties' postures on individual matters may be more or less justified, the EAJA . . . favors treating a case as an inclusive whole, rather than as atomized line-items."  Comm'r. I.N.S. v. Jean, 496 U.S. 154, 161-62 (1990).

While not conclusive, the Court also considers "the clarity of the governing law, that is, whether, at the time of the dispute, 'judicial decisions on the issue left the status of the law unsettled,' . . . and whether the legal issue was novel or difficult." Norris v. Sec. and Exch. Comm'n, 695 F.3d 1261, 1265 (Fed. Cir. 2012). If the law in a particular matter is unclear, the Court could find that the Government's position, based on its reasonable interpretation of prevailing law existing at the time, was justified and an award of attorney's fees is not warranted.

One purpose of EAJA's requirement that attorney's fees be awarded to the prevailing party when the Government's position is not justified is to discourage the Government from initiating unjustified litigation and "to enable citizens to vindicate their rights . . . particularly where, due to the government's greater resources and expertise and the limited amount at stake in relation to the cost of litigation, there otherwise would be no effective remedy, even in situations where the government was not justified . . . ." Id. at 1264.

**The Government's Position in Canceling the First Purchase Order Was Substantially Justified.**

The Government's position in canceling the first purchase order was substantially justified because Plaintiff did not provide the Raytheon 112 Part that the Government had requested. It is established that a purchase order is an offer to enter into a unilateral contract, and the Government is not bound until substantial performance occurs. Ulysses, 110 Fed. Cl. at 637. In its electronic quotation, Plaintiff communicated that it would provide 112 Parts manufactured by or under the direction of Raytheon. Id. In submitting that quotation electronically, Plaintiff represented that it was making a "bid without exception" to provide the Government with the "exact product" -- the CAGE 072E5 Raytheon part. Id. Because Plaintiff manufactured the part itself, and never provided a conforming product, no contract was ever formed. The Government's cancellation of its purchase order was therefore proper and its position on this aspect of the litigation was substantially justified. Id.

**The Government's Position in Canceling the Second Purchase Order Was Not Substantially Justified.**

That the Government's position was reasonable in one aspect of the dispute does not establish that its position in the entirety of the matter was justified. Jean, 496 U.S. at 161-62; Blakley v. United States, 593 F.3d 1337, 1341 (Fed. Cir. 2010) (citation omitted) (explaining that the "position of the United States" refers to the Government's position throughout the dispute, including its litigating position and the agency's administrative position). It is necessary to examine the Government's position in all aspects of the dispute to determine whether the Government's position was substantially justified.

In arguing that its position regarding cancellation of the second purchase order was substantially justified, the Government attempts to equate the circumstances surrounding the second purchase order with those surrounding the first. The Government argues that, as with the first purchase order, it requested Plaintiff supply a 112 Part manufactured by Frequency, but Plaintiff intended to deliver a part it manufactured itself. Def.'s Opp'n 5.

The Court, however, found the Government's explanation for its cancellation of the second purchase order "unsustainable," stating:

> There was no meeting of the minds here.  The Government thought it was going to get a Frequency part, and Plaintiff thought it had free rein to manufacture its own part.  Unlike the First Purchase Order, Plaintiff's interpretation was not based on unwarranted assumptions.  Rather, Plaintiff reasonably believed it could supply its own part given the wording of Ulysses' quote which did not mention Frequency.  How Frequency appeared in the Purchase Order after having been nowhere in the RFQ and nowhere in Plaintiff's facsimile quotation remains a mystery.  Plaintiff's second quotation was only sent via facsimile and contained none of the information in the DIBBS system.  Unlike in Plaintiff's electronic quotation in response to the First RFQ, there was no acknowledgement in the facsimile quote that Plaintiff had to provide an "exact product."  Under the circumstances, Plaintiff's belief that it could perform in accordance with its quotation and supply its own 112 Part was reasonable.  The Government's sole articulated rationale for canceling the Second Purchase Order – failure to supply the Frequency part- is unsustainable.

Ulysses, 110 Fed. Cl. at 639.

As held, the Government's decision to cancel the second purchase order was baseless.  The Government's rationale is that because Plaintiff was not going to supply the Frequency product it wanted, the Government was justified in canceling the order.  The Government, however, did not request the Frequency product in its quotation, and Plaintiff did not submit a quote for the Frequency part.  Id.  When the Government finally did mention the Frequency part in its second purchase order, the specification not only "came out of nowhere," but it was also unclear whether in referencing Frequency in the second purchase order, the Government was requiring that Plaintiff provide a Frequency part.  Id.  The second purchase order contained no explanation of why Frequency was listed, and it was reasonable for Plaintiff to interpret the inclusion of Frequency as a description of procurement history.  Id.  This supports a finding that the Government's position regarding the cancellation of the second purchase order was not substantially justified.  Cf. United Partition Sys., Inc. v. United States, 90 Fed. Cl. 74, 91 (2009) (finding that inconsistency in the Government's communication with the contractor rendered its position in terminating a contract for default not substantially justified).

**The Government's Position in Asserting its Counterclaims Under the False Claims Act Was Not Substantially Justified.**

Whether the Government was substantially justified in pursuing False Claims Act and fraud counterclaims appears to be an issue of first impression.  While the FCA serves as an important mechanism protecting the Government from making payments based on fraudulent claims, civil liability under the FCA results in the imposition of severe penalties and can render a contractor ineligible to do business with the Government.  48 C.F.R. 9.406-2(b)(1)(vi)(B) (2014).  Even the Government's mere initiation of an FCA action can raise a question about a contractor's integrity.  As such, the Government's sound exercise of its prosecutorial discretion

in bringing FCA and fraud suits is of paramount importance to the fair functioning of the federal procurement system.

The Government's counterclaim alleging that Plaintiff violated the False Claims Act was predicated on two contentions: 1) that Ulysses knowingly submitted a false quotation to obtain payment it knew it was ineligible to receive, and 2) that Ulysses filed a CDA claim seeking payment upon that "fraudulently obtained purchase order" and asserting that it was an approved manufacturer of the 112 Part. Ulysses, 110 Fed. Cl. at 641. The individual contentions were not grounded on sufficient proof, and these allegations collectively formed an inadequate foundation for such a serious and potentially detrimental allegation.

**The Government's Position that Plaintiff Violated the False Claims Act By Knowingly Submitting a False Quotation to Obtain Payment Was Not Substantially Justified.[2]**

To be liable under the False Claims Act, an individual either must have actual knowledge that the claim for payment that he is presenting is fraudulent or he must act in deliberate ignorance of or with reckless disregard for the truth. 31 U.S.C. § 3729 (2000). "Under the False Claims Act there must be a showing by the government of more than innocent mistake or mere negligence." UMC Elec. Co. v. United States, 43 Fed. Cl. 776, 795 (1999) (citing Wang ex rel. United States v. FMC Corp., 975 F.2d 1412, 1420 (9th Cir. 1992)).

The Government contends that Plaintiff's erroneous interpretation of the agency's specifications for the Raytheon part demonstrates that the Government was substantially justified in contending that Plaintiff made a misrepresentation. The Government argued:

> The evidence at trial demonstrated that Ulysses'[] misrepresentation was made knowingly within the meaning of the FCA, and was not the product of an innocent mistake in using the Government's DIBBS system. First in order to convey to the Government that it intended to supply a part made by or under the direction of Raytheon, Ulysses affirmatively indicated that it was submitting a bid without exception, and then availed itself of a drop down menu of approved

---

[2] The Government did not prevail in asserting that Plaintiff violated the FCA in submitting its quotation in response to the first RFQ in part because the quotation did not constitute a claim. Ulysses, 110 Fed. Cl. at 641 (citing 31 U.S.C. § 3729(c)(2000)).

The Government contends that at the time it adopted its position and while it defended its position, the prevailing case law regarding what constitutes a "claim" for payment under the FCA was unclear and therefore it was justified in asserting that Plaintiff's first quotation was in fact a claim for payment. Def.'s Opp'n 9-10.

Lack of legal precedent, however, is not conclusive in determining whether the Government's position was substantially justified. Miles Construction, LLC v. United States, 113 Fed. Cl. 174, 179 (2013). The fact that under prevailing law that existed at the time, the Government reasonably adopted its position that a quotation constituted a claim, does not render the entirety of its position in asserting FCA counterclaims substantially justified.

>sources from which it specifically identified the product that it purportedly intended to supply. That part was CAGE 072E5 P/N 178AS112, *i.e.,* a []112 part made by or at the direction of Raytheon.

Ulysses, 110 Fed. Cl. at 642 (citations omitted) (quoting Def.'s Post-Trial Br. 24). The Government's argument is unpersuasive.

In asserting its FCA claim, the Government equated Plaintiff's reasonable, yet erroneous, interpretation of the Government's less than clear specifications with a fraudulent representation to the Government under the FCA. Such a characterization of Plaintiff's conduct was an overreaction unsupported by legal authority. The Government did not prove who at Ulysses availed himself of the dropdown menu or that clicking on CAGE part 07E25 amounted to a misrepresentation rather than a misunderstanding. Because the phrase "approved source" did not appear in the first RFQ, it was reasonable for Plaintiff to interpret the reference to Raytheon in the purchase order to be a reflection of the procurement history for the 112 Part rather than a requirement that Plaintiff, at a much higher cost, actually supply the Raytheon part. Id. at 644. Plaintiff therefore plausibly understood that it could manufacture the 112 Part itself, and the Government was not substantially justified in claiming that Plaintiff's interpretation of its purchase order amounted to a misrepresentation actionable under the FCA.

As the Federal Circuit has recognized, "[i]f a contractor submits a claim based on a plausible but erroneous contract interpretation, the contractor will not be liable [under the FCA], absent some specific evidence of knowledge that the claim is false or intent to deceive." Comm. Contractors Inc. v. United States, 154 F.3d 1357, 1366 (Fed. Cir. 1998); Ulysses, 110 Fed. Cl. at 643. It is only when the contractor's interpretation "borders on the frivolous" that the contractor "risk[s] liability under the FCA." Comm. Contractors, 154 F.3d at 1366. Here, as this Court previously found, Plaintiff's interpretation of the purchase order did not "border on the frivolous."

Nor did the Government marshal any evidence that Plaintiff knowingly misrepresented what it was supplying. As the Court found, "[t]he Government failed to adduce any evidence that Mr. Tsoutsas or any employee of Ulysses actually read the notice, understood what that DIBBS notice meant, and intentionally falsified its quote by misrepresenting that it was going to provide the exact Raytheon part." Ulysses, 110 Fed. Cl at 642-43. As such, the Government did not meet its burden to prove Plaintiff's knowledge, rendering its position unjustified. See KMS Fusion, Inc. v. United States, 39 Fed. Cl. 593, 599 (1997) (finding that Defendant's inability to produce evidence supporting its allegation, indicated its position was not substantially justified).

The knowledge element of the False Claims Act can also be satisfied if the Government demonstrates that a party "acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(iii). The Government has the burden of proving by a preponderance of the evidence that Plaintiff acted with reckless disregard for the truth. 31 § U.S.C. 3731(c) (2000). Reckless disregard has been characterized as "'an extreme version of ordinary negligence.'" Gulf Grp. Gen. Enter. Co. W.L.L. v. United States, 114 Fed. Cl. 258, 315 (2013) (quoting United States ex rel. K & R Ltd. P'ship v. Mass. Hous. Fin. Agency, 530 F.3d 980, 983 (D.C. Cir.

8

2008)); see also, Riley Constr. Co. v. United States, 65 Fed. Cl. 264, 270 (2005) (stating that reckless disregard "has been defined in case law as something more than gross negligence, or gross negligence plus."). In its response to Plaintiff's application for attorney's fees, the Government argues:

> In the alternative, even if there were no proof of "actual knowledge" of Ulysses'[] intent to defraud in connection with its electronic quotation, a reasonable person certainly could have concluded that the quotation, with its clear representation that a part made by or under the direction of Raytheon, was submitted with "reckless disregard" as to its truth or falsity . . . any individual who thoughtlessly clicks past a warning screen of the type at issue in this case has colorably acted in reckless disregard of the truth of the information being submitted.

Def.'s Opp'n 14.

However, as this Court noted, the "First Purchase Order and the RFQ that gave rise to it were not models of clarity" and "[g]iven the cryptic language and structure of the RFQ, Mr. Tsoutsas' interpretation . . . was not so implausible as to be frivolous." Ulysses, 110 Fed. Cl. at 643-44. While the RFQ included a list of manufacturers, the list was unexplained and did not suggest that Plaintiff was to provide 112 Parts manufactured by one of those companies. Id. at 644. Therefore, the terms and context of the first purchase order were too ambiguous for the Court to conclude that whoever submitted Plaintiff's electronic bid had a reckless disregard for the truth.

Arguing it was justified in alleging that Plaintiff acted with reckless disregard for the truth, the Government points to "Ulysses' own explanation that the quotation may have been submitted by an erratic secretary with a drug problem." Def.'s Opp'n 14-15. The Government relies on the following testimony from Mr. Mort, the second in command at Ulysses:

> Q: Okay. Regardless of the time period, did Ms. Wilcox submit bids into the DIBBS system?
>
> A: Yes, she did.
>
> Q: Do you know if Mr. Tsoutsas was aware that Ms. Wilcox was submitting bids using the DIBBS system?
>
> A: Yes.
>
> * * *
>
> Q: And the facsimile, what about that?
>
> A: Well, the facsimile, unfortunately, is from Melstrom, and again that's [Mrs.] Wilcox, not to put her down or what have you, but she had the wrong company in there, and there's nowhere in there does it say it's from Ulysses, and it should

> have.  The CAGE code should have been in there with the part number, but it's only the part number on the fax.
>
> Q: The COURT:  And in 2002, did [Mrs. Wilcox] . . . work full time?
>
> A: Supposed to work full time, yes.
>
> Q: THE COURT: What do you mean by supposed to?
>
> A: If we could average 32 hours week out of her, we were pleased.
>
> Q: THE COURT: What happened when she wasn't there?
>
> A: She tended to have a drinking/drug problem.  She would go off to her – she had a place in Maryland and may or may not come back.

Tr. 318, 336-37.  Relating this testimony to the facts in United States v. Krizek, 111 F.3d 934 (D.C. Cir. 1997), the Government argued that Ulysses knowingly directed or permitted "a drug addled and erratic employee to enter quotations to the Government," without monitoring or verifying the her work, and accordingly, Ulysses acted with "reckless disregard of the truth or falsity of the information" submitted on its behalf to obtain payment from the Government.  Def.'s Supp. Post-Trial Br. 5-6.  There is no evidence before the Court that Mrs. Wilcox either entered the quote in question or regularly performed her job while impaired.  Plaintiff's actions did not rise to the level of gross negligence discussed in Krizek and required by the FCA.

In Krizek, the trial court concluded that the plaintiffs acted with reckless disregard under the FCA, finding that these plaintiffs submitted claims for reimbursement under Medicare and Medicaid "with little or no factual basis" and without review from the doctor to ensure the accuracy of the bills submitted on his behalf.  111 F.3d at 942.  In affirming the trial court's ruling, the D.C. Circuit noted that plaintiffs billed more than 24 hours in a single day on three separate occasions.  Id.

Here, unlike in Krizek, the face of the quote itself did not establish its falsity, and the Government did not prove who submitted the quotation or that Plaintiff acted with reckless disregard.  The Court found that "Mr. Tsoutsas disavowed any involvement with the electronic quotation, and the Government did not prove he submitted it."  Ulysses, 110 Fed. Cl. at 643.  Though the record suggested that the secretary may have submitted the quotation, Defendant did not call her as a witness to confirm or deny this.

**The Government's Position that Plaintiff Violated the False Claims Act in Submitting its CDA Claim and Therefore Forfeited That Claim Was Not Substantially Justified.**

The Government's position that Plaintiff, in submitting its bids and subsequent claim for payment, violated the False Claims Act and therefore also forfeited its claim under the CDA's fraud provision, was not substantially justified.  The Government claimed that Mr. Tsoutsas' testimony that Plaintiff was in fact an "approved source" evinced his knowledge that Ulysses

could not provide the product requested in the first purchase order. The Government also pointed out that in 1998, four years before Plaintiff entered into the instant contractual relationship in 2002, Plaintiff's sister company received a letter informing it that its 112 Part was not "eligible as an alternate item." Def.'s Opp'n 6 (citing JX 1; Tr. 71) (emphasis removed).

The Government failed to demonstrate that Plaintiff knew it was not an approved source and misrepresented itself as an approved source in submitting its claim for payment. First, in his correspondence with Mr. Kennedy, Mr. Tsoutsas explained his understanding that Plaintiff was an approved source and indicated that Plaintiff did not intend to bid or supply the Raytheon part. Ulysses, 110 Fed. Cl. at 645. Second, when Plaintiff filed its CDA claim, it did not simply state that it was an approved source. Id. Plaintiff articulated its understanding as to why it was an approved source and did not represent that it would supply the Raytheon part but candidly said it would not supply the Raytheon part because it was not required to. Plaintiff expressly stated: "Ulysses has always been considered an approved source for [the 112 Part] and the final component [the 100 Part]. If Ulysses was in fact not an approved source for [112] Parts, and [100], the agency had waived the requirement in the past." Id. at 644. Finally, Plaintiff noted in its CDA claim that "[t]he government failed to exercise proper discretion and inspect and perform First Article testing on the part." Id. Importantly, Plaintiff, in its CDA claim, never represented that it intended to bid the Raytheon part and the Government "marshaled no proof that Plaintiff intended to bid the Raytheon part, falsified its bid, and intended to substitute its own product." Id. at 645.

Throughout its relationship with the Government, from its correspondence with Mr. Kennedy to its filing of a CDA claim, Plaintiff credibly explained its understanding of why it thought it was an approved source. Therefore, it was unreasonable for the Government to claim that Plaintiff, in submitting its CDA claim, was seeking payment on a fraudulently obtained purchase order and falsely asserting that it was an approved source.

The Government's assertion that Plaintiff violated the FCA based on the second purchase order completely lacked justification.[3] Defendant alleged that Ulysses' certified claim was false or fraudulent, but this Court found that in seeking payment for the second purchase order, "Plaintiff's claim for payment . . . was in no way factually false—it never said it would provide a Frequency part." Id. It was therefore wholly unreasonable for the Government to argue that the second purchase order part of Plaintiff's CDA claim was false.

**The Government's Position in Asserting That Plaintiff Forfeited its Claims under the CDA's Fraud Provision Was Not Substantially Justified.**

The CDA's fraud provision provides:

> If a contractor is unable to support any part of his claim and it is determined that such inability is attributable to misrepresentation of fact or fraud on the part of the

---

[3] The Government alleged that "[i]n its certified claim to the contracting officer, Ulysses falsely claimed that it was entitled to payment under two Government contracts." Def.'s Countercls. ¶ 86 (emphasis added).

> contractor, he shall be liable to the Government for an amount equal to such unsupported part of the claim in addition to all costs to the Government attributable to the cost of reviewing said part of his claim.

41 U.S.C. § 604(c)(2) (2000).

Throughout this litigation, the Government argued that Plaintiff's belief that it was an approved source qualified to manufacture the 112 Part was equivalent to making a "misrepresentation of fact" to the Government to fraudulently obtain payment. As the Court noted, "[t]he concept of what constituted an approved source was murky." Ulysses, 110 Fed. Cl. at 648. Plaintiff and the Government simply had different understandings about whether Plaintiff was an approved source for the 112 Part. Plaintiff, in its claim for payment, candidly explained that based on its prior dealing with the Government, it thought Ulysses was an approved manufacturer. The Government's characterization of a genuinely held belief with "intent to deceive" was unjustified.

**The Government's Claim that Plaintiff Violated the FFCA Was Not Substantially Justified.**

Finally, the Government asserted that Plaintiff made false claims and violated the FFCA by claiming to be an approved manufacturer and presenting a certified claim to the contracting officer for payment with intent to defraud the Government.

Under the FFCA, "[a] claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof." Id. at 648 (quoting 28 U.S.C. § 2514 (2000)). The Government must "'establish by clear and convincing evidence that the contractor knew that its submitted claims were false, and that it intended to defraud the government by submitting those claims.'" Id. at 649 (quoting Daewoo Eng'g & Constr. Co. v. United States, 557 F.3d 1332, 1341 (Fed. Cir. 2009)).

As this Court found:

> Plaintiff asserted a different interpretation of the requirements of the First Purchase Order than the Government. So too, Ulysses argued in its claim that by accepting its 112 Parts as components of its 100 Parts, the Government had waived the approved source requirement in the past—a legal position not a factual representation. Plaintiff informed the Government of its legal position in writing several times. As evidenced in the communications between Mr. Tsoutsas and Mr. Kennedy, Mr. Tsoutsas was convinced that Ulysses was an approved source and could provide self-manufactured 112 Parts under both purchase orders. Indeed, Mr. Tsoutsas' agitated demeanor during his testimony exhibited his frustration with the Government's failure to recognize his company as an approved source—a conclusion he apparently thought was obvious.
>
> Plaintiff's interpretation was in essence a legal call about what would meet the requirements of the Purchase Orders. In the case of the First Purchase Order,

> Plaintiff determined that it could manufacture the 112 Part itself and was not obligated to supply the 112 Part manufactured by Raytheon. Plaintiff's belief that it could do this was wrong, but it was not a false claim predicated on a falsification or misrepresentation of a fact. Plaintiff demonstrated that it had no intention of providing the Raytheon part—because of its interpretation of its quote, the Purchase Order's requirements, and its view that it was an approved source to manufacture the part itself. The parties' course of dealing—in particular, Mr. Tsoutsas' extensive correspondence with Mr. Kennedy—bears out Plaintiff's position, and Defendant has marshaled no proof that Plaintiff intended to bid the Raytheon part, falsified its bid, and intended to substitute its own product. Rather, the record indicates that Plaintiff intended to (and thought that it did) bid its own 112 Part all along.
>
> * * *
>
> When Ulysses filed its CDA claim in 2006, the Government was well aware of Ulysses' view that it was an approved source because it had provided the 100 Part and the 114 Parts to the Government. Mr. Tsoutsas had informed the Government of his position in writing numerous times between 2002 and 2006, prior to submitting Ulysses' CDA claim on February 16, 2006 . . . .
>
> * * *
>
> Ulysses candidly advised the Government of its position that it believed it was an approved source, capable of manufacturing the part itself and did not attempt to deceive or mislead the Government in representing its status. The Government knew that Ulysses had not gone through the Source Approval Request process because Ulysses told it so. Further, Ulysses persisted in arguing that it should not have had to undergo this process because it had already manufactured the 112 Part for the Government as a component of a larger part. Ulysses' effort to have the Government test its 112 Part is further evidence that it believed it deserved to be an approved source in its own right—not that it was attempting to pass off its product as a Raytheon or Frequency part. Ulysses told the Government the truth about its status . . . .

Id. at 645-49 (citations omitted).

The Government asserts that Plaintiff's response to the first RFQ was actionable under the FFCA. Def.'s Opp'n 5-9. As with the Government's unfounded assertion that Plaintiff submitted a fraudulent "claim" to the contracting officer with intent to defraud the Government, the Government's FFCA claim was not justified. As the Court pointed out in its opinion:

> Ulysses recognized that the Government did not deem Ulysses an approved source but disagreed with that legal interpretation and continued to press its position that it should be recognized as an approved source. . . . Ulysses' action in pressing its interpretation of the term "approved source" and advocating it

13

qualified as such a source is a far cry from either intentionally falsifying a claim or submitting a claim with intent to defraud the Government.

Ulysses, 110 Fed. Cl. at 650.

**An Award of Attorney's Fees Is Appropriate Here.**

Plaintiff seeks $26,684.75 in attorney's fees and related nontaxable expenses. See Pl.'s Reply Br. 2-3. EAJA provides that the Court, in its discretion, may reduce the amount to be awarded. 28 U.S.C. § 2412(d)(1)(C) (2012). "Under the theory of apportionment, a contractor who receives only a partial judgment is a 'prevailing party' under the EAJA and may recover a pro rata portion of its fees and expenses." Cmty. Heating & Plumbing Co., Inc. v. Garrett, 2 F.3d 1143, 1146 (Fed. Cir. 1993) (citing Naekel v. Dep't of Transp., Fed. Aviation Admin., 884 F.2d 1378, 1379 (Fed. Cir. 1989)). The Government contends that if the Court grants an award of attorney's fees, Plaintiff's ability to recover should be reduced to account only for the success it had in the dispute. Def.'s Opp'n 17. Although the Court could reduce the attorney's fees to make them proportional to issues on which Plaintiff prevailed, it does not do so here. Dalles Irrigation Dis. v. United States, 91 Fed. Cl. 689, 703 (2010). A ratio that compares the total number of issues presented in a case with the number of issues a party prevailed on "provides little aid in determining what is a reasonable fee in light of all the relevant factors." Hubbard v. United States, 480 F.3d 1327, 1334 (Fed. Cir. 2007) (quoting Henlsey v. Eckerhart, 461 U.S. 424, 435 (1983)). A "simple mathematical formula" is not adequate to determine a plaintiff's pro rata portion. Adde v. United States, 98 Fed. Cl. 517, 530 (2011) (citing Hubbard, 480 F.3d at 1333-34) (rejecting Defendant's suggestion to award the plaintiff 0.06% of the fees requested because the plaintiff had obtained only 0.06% of his requested damages); Cmty. Heating & Plumbing Co., 2 F.3d at 1146 (rejecting "the ratio of successful claims to total claims" apportionment method); Naekel, 884 F.2d at 1379 (rejecting the apportionment of attorney fees based on a "mathematical count of issues," e.g., the number of pages of discussion devoted to different claims in briefs).

In United Partition Systems Inc., v. United States, the Court determined that, although the plaintiff was only awarded 81% of the damages it sought in litigation, in defeating the Government's jurisdictional challenge, succeeding on the merits of the case, and defending against the Government's counterclaims, the plaintiff had achieved "substantial success" justifying a full recovery of attorney's fees. 95 Fed. Cl. 42, 57 (2010). Here, Plaintiff recovered $39,780 of the $95,115 it sought from the Government, and successfully defended against the Government's four counterclaims. Although Plaintiff received less than half of the damages it sought, it prevailed on a claim where the Government's position was tenuous, and defeated substantial counterclaims. As such, the Court awards Plaintiff all of its attorney's fees and expenses.

Plaintiff requests attorney's fees totaling $24,493.79, reflecting 132.5 hours of attorney time incurred by the attorney of record.[4] Plaintiff submitted detailed invoices for services

---

[4] Plaintiff initially applied for $25,931.65 representing 140.3 hours of work and $2,531.56 in expenses. Pl.'s Mot. 5. In opposing Plaintiff's application, Defendant argued that

rendered between July 2011 and January 2014, and with a cost of living adjustment, seeks an hourly rate of $184.83. EAJA provides that "attorney fees shall not be awarded in excess of $125 per hour unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee." 28 U.S.C. § 2412(d)(2)(A)(ii). It is within the Court's discretion whether to apply a cost of living adjustment. <u>Prochazka v. United States</u>, 116 Fed. Cl. 444, 460 (2014) (citing <u>Oliveira v. United States</u>, 827 F.2d 735, 742 (Fed. Cir. 1987)). The justification for a cost of living adjustment "is self-evident if the applicant alleges that the cost of living has increased, as measured by the Department of Labor's Consumer Price Index ('CPI')" and supplies the Court with relevant CPI data. <u>BCPeabody Constr. Servs., Inc. v. United States</u>, No. 13-378C, 2014 WL 3640776, at *5 (Fed. Cl. July 23, 2014) (citing <u>Cal. Marine Cleaning, Inc. v. United States</u>, 43 Fed. Cl. 724, 733 (1999) and <u>Infiniti Info. Solutions, LLC v. United States</u>, 94 Fed. Cl. 740, 751 (2010) (citations omitted)); <u>see also</u> <u>Meyer v. Sullivan</u>, 958 F.2d 1029, 1035 n.9 (11th Cir.1992) (explaining that "[t]he Supreme Court has implied that applying a cost-of-living adjustment under the EAJA is next to automatic"). Citing the CPI and comparing the Index for March 1996, with the Index of October 2012 as the mid-point for the legal services rendered, Plaintiff calculates the cost-of-living adjustment as follows:

$125 hour x (230.221/155.7 cost-of-living adjustment) = $184.83

Pl.'s Mot. 5. The Government does not contest the 132.5 hours or the $184.83 hourly rate, and the Court finds the 132.5 hours expended by Plaintiff's counsel are reasonable and compensable.

Plaintiff also seeks $2,190.96 for related nontaxable expenses, including $432.72 for Federal Express costs, $30.00 for taxi services, $1,785.80 for transcript fees, and $29.00 for online research. Pl.'s Mot. Attach. 2. The Government does not contest these costs, and the Court finds these expenses totaling $2,190.96 reasonable for this litigation.

## <u>Conclusion</u>

For the reasons stated, Ulysses' application for attorney's fees and expenses under EAJA is **GRANTED**. Ulysses is awarded $24,493.79 in attorney's fees and $2,190.96 in expenses. In total, Ulysses is awarded $26,684.75. The Clerk is directed to enter judgment accordingly.

s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Judge**

---

the fees and expenses incurred by Ulysses in connection with its dispute with former counsel in this case are not properly chargeable to the Government. Def.'s Opp'n 15. Conceding this, Plaintiff deducted $1,778.46 from its application, consisting of $1,437.86 in attorney's fees and $340.60 in costs. Pl.'s Reply Br. 2-3.